# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
April 5, 2017 Session

## JEAN DEDMON v. DEBBIE STEELMAN ET AL.

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Crockett County**
**No. 3228     Clayburn Peeples, Judge**

_____

## No. W2015-01462-SC-R11-CV

_____

We granted this appeal to address whether our holding in *West v. Shelby County Healthcare Corp.*, 459 S.W.3d 33 (Tenn. 2014), applies in personal injury cases. We hold that it does not. *West* held that "reasonable charges" for medical services under Tennessee's Hospital Lien Act, Tennessee Code Annotated sections 29-22-101 to –107 (2012), are the discounted amounts a hospital accepts as full payment from patients' private insurers, not the full, undiscounted amounts billed to patients. *West*, 459 S.W.3d at 46. *West* defined "reasonable charges" in the context of interpreting the Hospital Lien Act, and its holding is limited to that Act. As an alternative argument, we are asked in this appeal to consider applying the principles in *West* to the determination of reasonable medical expenses in personal injury cases. Doing so involves the collateral source rule, which excludes evidence of benefits to the plaintiff from sources collateral to the tortfeasor and precludes the reduction of the plaintiff's damage award by such collateral payments. The rule is based on the principles that tortfeasors should be responsible for all of the harm they cause and that payments from collateral sources intended to benefit an injured party should not be used to reduce the liability of the party who inflicted the injury. After a thorough review of court decisions in Tennessee and across the country on the collateral source rule, we decline to alter existing law in Tennessee. We hold that the collateral source rule applies in this personal injury case, in which the collateral benefit at issue is private insurance. Consequently, the plaintiffs may submit evidence of the injured party's full, undiscounted medical bills as proof of reasonable medical expenses. Furthermore, the defendants are precluded from submitting evidence of discounted rates accepted by medical providers from the insurer to rebut the plaintiffs' proof that the full, undiscounted charges are reasonable. The defendants remain free to submit any other competent evidence to rebut the plaintiffs' proof on the reasonableness of the medical expenses, so long as that evidence does not contravene the collateral

source rule. The decision of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded to the trial court for further proceedings.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed in Part and Reversed in Part; Case Remanded to the Trial Court**

HOLLY KIRBY, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, SHARON G. LEE, and ROGER A. PAGE, JJ., joined.

Melanie M. Stewart, Memphis, Tennessee, for the appellants, Debbie Steelman, and Danny T. Cates, Sr., as co-personal representatives of the Estate of John T. Cook, deceased.

Glenn K. Vines, Mark N. Geller, Kevin N. Graham, and Jason J. Yasinsky, Memphis, Tennessee, for the appellee, Jean Dedmon.

Bradford D. Box and Adam P. Nelson, Jackson, Tennessee, for the Amicus Curiae, the Tennessee Defense Lawyers Association.

W. Bryan Smith, Memphis, Tennessee; John Vail, Washington, D.C.; and Brian G. Brooks, Greenbrier, Arkansas, for the Amicus Curiae, Tennessee Trial Lawyers Association.


# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts in this appeal are undisputed. In February 2010, Plaintiff/Appellee Jean Dedmon was involved in an automobile accident with John T. Cook. Mrs. Dedmon was seriously injured in the accident. Mrs. Dedmon and her husband, Fred Dedmon (collectively, "Plaintiffs"), filed this lawsuit against Mr. Cook, alleging that his negligence caused Mrs. Dedmon to suffer severe and permanent injuries and to incur past and future medical expenses. The complaint itemized Mrs. Dedmon's medical bills from sixteen different medical providers, which totaled $52,482.87. The bills were attached to the complaint.

- 2 -

After the complaint was filed, Mr. Cook died.  In September 2013, the Plaintiffs filed an amended complaint substituting Mr. Cook's personal representatives, Debbie Steelman and Danny T. Cates (collectively, "Defendants"), for Mr. Cook.[1]

Meanwhile, in March 2013, the Plaintiffs deposed one of Mrs. Dedmon's treating physicians, neurosurgeon Vaughn Allen, M.D.  Dr. Allen treated Mrs. Dedmon between April 2010 and September 2012, and in September 2010, he performed neck surgery on her.[2]  In his deposition, Dr. Allen testified that all of Mrs. Dedmon's medical bills, including those from his own clinic and those from Mrs. Dedmon's other medical providers (hospitals, physical therapists, radiologists, etc.), were reasonable and necessary to a reasonable degree of medical certainty.  Dr. Allen's deposition was filed in the trial court, and the medical bills were attached as exhibits.[3]

On December 19, 2014, this Court issued its decision in *West v. Shelby County Healthcare Corp.*, 459 S.W.3d 33 (Tenn. 2014).  *West* interpreted Tennessee's Hospital Lien Act (HLA), Tennessee Code Annotated sections 29-22-101 to –107 (2012).  We will discuss *West* in more detail below, but suffice it to say at this juncture that *West* held that a hospital's "reasonable charges" under Section 29-22-101(a) are the amount the hospital accepts from the patient's private insurer, not the amount in the medical bills sent to the patient.  *West*, 459 S.W.3d at 46.  In the course of its analysis, the *West* Court commented that the amount of the full, undiscounted charges billed to the patient is "unreasonable" as compared to the amount of the discounted bills paid by the insurer.  *Id.* at 44.  The undiscounted bills sent to the patient, the *West* opinion stated, do "not 'reflect what is [actually] being paid in the market place.'  Because 'virtually no public or private insurer actually pays the full charges[,] . . . [a] more realistic standard is what insurers actually pay and what hospitals [are] willing to accept.'"  *Id.* at 45 (quoting *What's the Cost?: Proposals to Provide Consumers with Better Information about Healthcare Service Costs: Hearing Before the Subcomm. on Health of the House Comm. on Energy and Commerce*, 109th Cong. 99 (2006) (statement of Dr. Gerard Anderson, Professor, Bloomberg School of Public Health & School of Medicine at Johns Hopkins University; Director, Johns Hopkins Center for Hospital Finance and Management)).

---

[1] The amended complaint did not include an itemization of Mrs. Dedmon's medical bills, nor did it attach Mrs. Dedmon's medical bills.

[2] Mrs. Dedmon underwent a cervical laminectomy and foraminotomy, which are basically decompression surgeries intended to take some of the pressure off the spinal nerves.

[3] There is no challenge to Dr. Allen's qualifications to testify as to the reasonableness and necessity of Mrs. Dedmon's medical bills.

Prompted by the holding in *West*, the Defendants in the instant case filed a "Motion in Limine to Exclude Evidence of Unreasonable Medical Charges."[4] Citing *West*, they argued that evidence of Mrs. Dedmon's full, undiscounted medical bills must be excluded because the amounts of those bills are, as a matter of law, unreasonable. The Defendants asserted that *West*'s pronouncements on hospital bills "set[ ] forth a new standard in Tennessee, as a matter of law." According to the Defendants' calculations, Mrs. Dedmon's health insurer paid only $18,255.42 to satisfy Mrs. Dedmon's medical bills. As a result, they argued, the full charges reflected in Mrs. Dedmon's medical bills are irrelevant and should be excluded on that basis.

The Defendants also took the position in their motion that "[t]he collateral source rule does not apply to [the] issue" of whether the discounted amounts paid by Mrs. Dedmon's insurance company are admissible. They insisted that "evidence of payment of the medical expenses by medical insurance will not be used to show that the medical expenses have been paid in an attempt to mitigate the damages. Rather, the evidence would be used to show whether the charges are reasonable, as defined by the Supreme Court." We interpret the Defendants' position in the motion *in limine* as arguing that the amount paid by Mrs. Dedmon's insurance company should be submitted into evidence *instead of* the undiscounted medical bills sent to the patient. Under the Defendants' reasoning, there is purportedly no need to mention the fact that the discounted amounts resulted from Mrs. Dedmon's insurance contract, so the collateral source rule would not be violated.

In addition to the motion *in limine*, the Defendants filed a "Notice of Intent to Rebut Presumption Pursuant to T.C.A. § 24-5-113." *See* Tenn. Code Ann. § 24-5-113(b)(2). The notice, like the motion *in limine*, was based solely on the Defendants' interpretation of *West*. The Defendants argued that, if the full, undiscounted medical bills are admitted into evidence, then the discounted amounts accepted by the medical provider should be admissible to rebut the Plaintiffs' expert testimony that the undiscounted charges are reasonable. They argued that, in comparing the two bills, the full, undiscounted medical bills are unreasonable "under the *West* standard."

In March 2015, the trial court conducted a hearing on the Defendants' motion *in limine*. The trial court agreed with the Defendants that, based on *West*, Mrs. Dedmon's full, undiscounted medical bills are irrelevant to the question of her reasonable medical expenses and that the discounted amounts paid by Mrs. Dedmon's insurer constituted her reasonable medical expenses as a matter of law. Accordingly, it granted the motion *in*

---

[4] The Defendants did not challenge the necessity of Mrs. Dedmon's medical bills.

- 4 -

*limine* and excluded evidence of Mrs. Dedmon's full, undiscounted medical bills. The trial court commented that it interpreted *West* as having advanced a policy of not allowing "the subterfuge that the medical community uses with regard to insurance and expenses to sully the court system." The trial court added that it could not "imagine that [this Court] would use any other logic in this situation than they used in [the hospital lien statute] situation."

Mrs. Dedmon sought permission for an interlocutory appeal from the trial court's order. Permission was granted by both the trial court and the Court of Appeals. *See* Tenn. R. App. P. 9.

The Court of Appeals reversed. *See Dedmon v. Steelman*, No. W2015-01462-COA-R9-CV, 2016 WL 3219070, at *11 (Tenn. Ct. App. June 2, 2016), *perm. app. granted* (Tenn. Oct. 21, 2016). Citing limiting language in *West*, the appellate court concluded that *West* did not apply to personal injury cases. *Id.* at *9. The language in *West* cited by the Court of Appeals included a comment that *West* was intended to define "reasonable charges for the purpose of Tenn. Code Ann. § 29-22-101(a)," *id.* (citing *West*, 459 S.W.3d at 44), and a footnote stating that the *West* holding was limited to private insurance cases, *id.* (citing *West*, 459 S.W.3d at 39 n.2). The intermediate appellate court reasoned: "If the [*West*] [C]ourt did not intend for its opinion to apply to hospital liens in all circumstances, surely the court did not intend for its opinion to be binding as to all determinations of reasonable medical expenses under Tennessee law." *Id.* Thus, the Court of Appeals rejected the Defendants' argument that *West* required the exclusion of Mrs. Dedmon's full, undiscounted medical bills and reversed the trial court's grant of the Defendants' motion *in limine*. *Id.* at *10.

The Court of Appeals then went further. It addressed the evidence that would be permissible on remand to rebut the Plaintiffs' expert testimony that the undiscounted medical bills represented Mrs. Dedmon's reasonable medical expenses. It held that evidence of discounted amounts accepted by Mrs. Dedmon's medical providers may be admissible to rebut the Plaintiffs' expert testimony on the reasonableness of the amount of the full, undiscounted bills. The appellate court acknowledged the collateral source rule, which generally provides that collateral-source benefits such as insurance must not be used to "diminish the damages otherwise recoverable from the defendant." *Id.* at *10 n.8 (quoting *Nance ex rel. Nance v. Westside Hosp.*, 750 S.W.2d 740, 742 (Tenn. 1988)). It then commented, however, that "existing law in this state also makes clear that Defendants are permitted to offer proof contradicting the reasonableness of the medical expenses," *id.* at 11, citing cases from other jurisdictions holding that discounted amounts accepted by medical providers are admissible to rebut the Plaintiffs' proof of the

reasonableness of the full, undiscounted medical bills, so long as insurance is not mentioned. *Id.* (quoting *Martinez v. Milburn Enters., Inc.*, 233 P.3d 205, 222-23 (Kan. 2010)) (citing *Stanley v. Walker*, 906 N.E.2d 852, 858 (Ind. 2009) (holding that the collateral source rule does not bar evidence of discounted amounts so long as that evidence is "introduced . . . without referencing insurance")). In a separate concurrence, Judge Joe G. Riley took the position that the majority's apparent approval of the "hybrid" method—allowing evidence of both the full, undiscounted medical bills and also the discounted amounts accepted by medical providers—"is dictated by existing case law" in Tennessee.[5] *Id.* (Riley, J., concurring).

In sum, the Court of Appeals reversed the trial court's grant of the Defendants' motion *in limine* and held that Mrs. Dedmon's full, undiscounted medical bills were admissible to prove her reasonable medical expenses resulting from the accident. It also indicated that evidence of the discounted amounts accepted by Mrs. Dedmon's medical providers is admissible to rebut the Plaintiffs' proof that the undiscounted medical bills are reasonable, so long as insurance is not mentioned. *Id.* The Court of Appeals concluded by asking this Court to accept review in this case to address these important issues. *Id.* We granted the Defendants' application for permission to appeal.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal to this Court, the Defendants make the same argument they made in the lower courts, namely, that the holding in *West* applies in this case to exclude Mrs. Dedmon's full, undiscounted medical bills from the evidence regarding her reasonable medical expenses. If *West* does not apply directly, the Defendants argue, the *West* principles should nevertheless apply in personal injury cases to limit a plaintiff's recovery of "reasonable medical expenses" to the discounted amounts accepted by medical providers.

All of the issues raised by the Defendants are questions of law, which we review de novo, affording no deference to the decisions of the lower courts. *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008).

## ANALYSIS

---

[5] Judge Riley's separate concurrence also argued that this Court should extend the reasoning in *West* to personal injury litigation. *Id.*

- 6 -

To address the issues raised in this appeal, we first review Tennessee law on damages in personal injury cases and the current status of the collateral source rule in Tennessee. We next review our holding in *West* and address whether the definition of "reasonable charges" under the HLA should be applied to the issue of the "reasonable medical expenses" recoverable in personal injury cases. If the rule in *West* is not directly applicable, we will consider whether any of the principles in *West* should be applied in personal injury cases to exclude evidence of Mrs. Dedmon's undiscounted medical bills. If not, we will address the Court of Appeals' language indicating that defendants may submit evidence of discounted amounts accepted by medical providers in order to rebut evidence that the undiscounted medical bills constitute reasonable medical expenses.

## A. Existing Tennessee Law

### 1. Damages

"A person who is injured by another's negligence may recover damages from the other person for all past, present, and prospective harm." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 267 (Tenn. 2015) (quoting *Singh v. Larry Fowler Trucking, Inc.*, 390 S.W.3d 280, 287-88 (Tenn. Ct. App. 2012)). "An award of damages, which is intended to make a plaintiff whole, compensates the plaintiff for damage or injury caused by a defendant's wrongful conduct." *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 419 (Tenn. 2013) (citing *Inland Container Corp. v. March*, 529 S.W.2d 43, 44 (Tenn. 1975)). "The party seeking damages has the burden of proving them." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999).

A plaintiff who is injured by another's negligence is entitled to recover two types of damages: economic (or pecuniary) damages and non-economic (or personal) damages. *Meals*, 417 S.W.3d at 419-20. Economic damages include past medical expenses, future medical expenses, lost wages, and lost earning potential.[6] *Id.* at 419. A plaintiff may seek recovery for all "economic losses that naturally result from the defendant's wrongful conduct." *Id.*

---

[6] Past medical expenses have sometimes been referred to as "out-of-pocket" medical expenses. The *Meals* Court said that, in this context, the term "out-of-pocket" medical expenses merely means past medical expenses as contrasted with future medical expenses. *See Meals*, 417 S.W.3d at 421 (noting that the trial judge must consider "past and future medical bills" in assessing the reasonableness of the jury verdict); *id.* at 425 (evaluating the plaintiff's "economic damages, including past medical bills, future medical bills, and lost earning capacity").

"Non-economic damages include pain and suffering, permanent impairment and/or disfigurement, and loss of enjoyment of life." *Id.* at 420 (quoting *Elliot v. Cobb*, 320 S.W.3d 246, 247 (Tenn. 2010)). Non-economic damages are often highly subjective and are not susceptible to proof by a specific dollar amount. While there must be some evidence to justify the amount awarded, plaintiffs are not required to prove the monetary value of non-economic damages because such injuries are not easily quantified in economic terms. For this reason, the trier of fact is given broad latitude in fixing the monetary amount of non-economic damages. *Id.*; *Coakley v. Daniels*, 840 S.W.2d 367, 372 (Tenn. Ct. App. 1992) (emphasizing that damages for personal injuries are not based on fixed rules of law and are generally left to the trier of fact). In practice, "the traditional lawyer's rule-of-thumb" is often to value the non-economic damages based on a multiple of the amount of the plaintiff's economic damages. *See Meals ex rel Meals v. Ford Motor Co.*, No. W2010-01493-COA-R3-CV, 2012 WL 1264454, at *27 (Tenn. Ct. App. Apr. 13, 2012) (Kirby, J., dissenting), *rev'd on other grounds*, 417 S.W.3d 414 (Tenn. 2013).

In this case, the economic damages at issue are past medical expenses. For this type of award, a plaintiff must prove that the medical bills paid or accrued because of the defendant's negligence were both "necessary and reasonable." *Borner v. Autry*, 284 S.W.3d 216, 218 (Tenn. 2009) (citing 22 Am. Jur. 2d *Damages* § 166 (2003 & Westlaw 2008); 25 C.J.S. *Damages* § 259 (2002 & Westlaw 2008)); *see West*, 459 S.W.3d at 44 ("[R]ecoveries for medical expenses in personal injury cases are limited to those expenses that are 'reasonable and necessary.'"). "In all but the most obvious and routine cases, plaintiffs must present competent expert testimony to meet this burden of proof." *Borner*, 284 S.W.3d at 218. "A physician who is familiar with the extent and nature of the medical treatment a party has received may give an opinion concerning the necessity of another physician's services and the reasonableness of the charges." *Long v. Mattingly*, 797 S.W.2d 889, 893 (Tenn. Ct. App. 1990) (citing *Emp'rs Ins. of Wausau v. Carter*, 522 S.W.2d 175, 176 (Tenn. 1975)). "To be qualified to render these opinions, the physician must first demonstrate (1) knowledge of the party's condition, (2) knowledge of the treatment the party received, (3) knowledge of the customary treatment options for the condition in the medical community where the treatment was rendered, and (4) knowledge of the customary charges for the treatment." *Id.*

Our Court of Appeals has explained that, in Tennessee, the focus is on "the 'reasonable' *value* of 'necessary' services rendered." *Fye v. Kennedy*, 991 S.W.2d 754, 764 (Tenn. Ct. App. 1998) (emphasis in original). In other words, even if it is undisputed that the medical services were necessary, the plaintiff must prove "that the charges in question were 'reasonable.'" *Id.* To rebut the plaintiff's proof on medical expenses, the

"defendant is permitted to introduce relevant evidence regarding necessity, reasonableness, and whether a claimed service was actually rendered." *Id.*

For small claims, Tennessee Code Annotated section 24-5-113(a) provides for a rebuttable presumption that medical bills of $4,000 or less that are itemized and attached to the complaint create a *prima facie* presumption that the bills are both necessary and reasonable:

> (a)(1) Proof in any civil action that medical, hospital[,] or doctor bills were paid or incurred because of any illness, disease, or injury may be itemized in the complaint or civil warrant with a copy of bills paid or incurred attached as an exhibit to the complaint or civil warrant. The bills itemized and attached as an exhibit shall be prima facie evidence that the bills so paid or incurred were necessary and reasonable.
>
> (2) This section shall apply only in personal injury actions brought in any court by injured parties against the persons responsible for causing such injuries.
>
> (3) This prima facie presumption shall apply to the medical, hospital[,] and doctor bills itemized with copies of bills attached to the complaint or civil warrant; provided, that the total amount of such bills does not exceed the sum of four thousand dollars ($4,000).

Tenn. Code Ann. § 24-5-113(a). The subsection (a) small-claims presumption "assists claimants for whom the expense of deposing an expert may exceed the value of the medical services for which recovery is sought." *Borner*, 284 S.W.3d at 218. This presumption may be rebutted "by proof contradicting either the necessity or reasonableness of the medical expenses." *Id.*

Subsection (b) of the same statute sets forth another procedure to create a rebuttable presumption of the reasonableness (but not the necessity) of the plaintiff's medical bills:

> (b)(1) In addition to the procedure described in subsection (a), in any civil action for personal injury brought by an injured party against the person or persons alleged to be responsible for causing the injury, if an itemization of or copies of the medical, hospital[,] or doctor bills which were paid or incurred because of such personal injury are served upon the other parties at least ninety (90) days prior to the date set for trial, there

- 9 -

shall be a rebuttable presumption that such medical, hospital[,] or doctor bills are reasonable.

(2) Any party desiring to offer evidence at trial to rebut the presumption shall serve upon the other parties, at least forty-five (45) days prior to the date set for trial, a statement of that party's intention to rebut the presumption. Such statement shall specify which bill or bills the party believes to be unreasonable.

Tenn. Code Ann. § 24-5-113(b). The presumption of reasonableness in subsection (b) can apply to medical expense claims of any size. *See Boettcher v. Shelter Mut. Ins. Co.*, No. 2:14-cv-02796-JPM-dkv, 2016 WL 3212184, at *2 (W.D. Tenn. 2016) (citing *Hogan v. Reese*, No. 01-A-01-9801-CV-00023, 1998 WL 430627, at *7 (Tenn. Ct. App. July 21, 1998) (noting that subsection (b), added in 1989, "is not limited as to the amount of such medical bills")).

As is apparent from the statutory language, the presumption statute establishes two different presumptions. Compliance with subsection (a) of Section 24-5-113 creates a presumption of both necessity and reasonableness. In contrast, compliance with subsection (b) of Section 24-5-113 creates a presumption only that the medical bills are *reasonable*. *Id.* at *2 n.2 (citing *Laird v. Doyle*, No. 02A01-9707-CV-00153, 1998 WL 74258, at *2-3 (Tenn. Ct. App. Feb. 24, 1998)). At trial, defendants may present evidence to rebut the presumption of reasonableness in subsection (b)(1) by following the procedures set out in subsection (b)(2). *Id.* (citing Tenn. Code Ann. § 24-5-113(b)(2)).

Regardless of any presumption of necessity and/or reasonableness of medical expenses under subsections (a) or (b) of Section 24-5-113, plaintiffs must always establish causation, i.e., "that the injuries or condition for which the medical treatment was sought was caused by the conduct of the defendant." *Iloube v. Cain*, 397 S.W.3d 597, 603 (Tenn. Ct. App. 2012).

### *2. Collateral Source Rule*

The collateral source rule originated from the common law in England as early as 1823. *See* Dag E. Ytreberg, Annotation, *Collateral Source Rule: Injured Person's Hospitalization or Medical Insurance as Affecting Damages Recoverable*, 77 A.L.R.3d 415, § 2[a] (1977). It was adopted in the United States in 1854 by the United States Supreme Court in *The Propeller Monticello v. Mollison*, 58 U.S. (17 How.) 152 (1854). *Id.*; *see also Mitchell v. Haldar*, 883 A.2d 32, 37 & n.4; *Baptist Healthcare Sys., Inc. v.*

*Miller*, 177 S.W.3d 676, 687 (Ky. 2005); *Bozeman v. State*, 879 So. 2d 692, 700 (La. 2004); *Perreira v. Rediger*, 778 A.2d 429, 433 (N.J. 2001); *Kenney v. Liston*, 760 S.E.2d 434, 440 & n.9 (W. Va. 2014). *Mollison* involved a collision between a steamship (*The Propeller Monticello*) and a schooner (the *Northwestern*) carrying a cargo of salt. The collision caused the schooner to sink. *Mollison*, 58 U.S. at 153. The schooner's owner, Mollison, recovered for the loss under his insurance policy. When Mollison sued the owner of the steamship for damages, the steamship owner denied liability based on Mollison's recovery under his insurance policy. *Id.* at 155. The United States Supreme Court rejected that argument, holding that the steamship owner could not benefit from Mollison's receipt of proceeds from his insurance policy. It explained that Mollison's insurance contract was "in the nature of a wager between third parties, with which the [steamship owner] has no concern. The insurer does not stand in the relation of a joint [tortfeasor], so that satisfaction accepted from [it] shall be a release of others." *Id.* The Court noted that its holding relied upon a doctrine that was "well established at common law and received in courts of admiralty." *Id.* The Court emphasized that the tortfeasor "is bound to make satisfaction for the injury he has done." *Id.*

By 1876, it was "well settled that the reception of the amount of the loss from the insurers is no bar to an action subsequently commenced against the wrong-doer to recover compensation for [an] injury occasioned by [a] collision." *The Atlas*, 93 U.S. 302, 310 (1876). *Atlas* recognized that "[n]one can recover twice for the same injury." *Id.* Nevertheless, the United States Supreme Court reasoned: "Compensation by the wrong-doer after payment by the insurers is not double compensation, for the plain reason that insurance is an indemnity; and it is clear that the wrong-doers are first liable, and that the insurers, if they pay first, are entitled to be subrogated to the rights of the insured against the insurers." *Id.* at 310-11; *see id.* at 310 (indicating the rule is based on the principle "that a wrong-doer in such a case cannot claim the benefit of the contract of insurance if effected by the person whose property he has injured").

The term "collateral source" derived from language used in a Vermont decision, *Harding v. Town of Townshend*, 43 Vt. 536 (1871). *See* Charles R. Mendez, *The Impact of the Affordable Care Act on the Colorado Collateral Source Rule*, 94 Denv. L. Rev. Online 1, 2 n.7 (2017); *see also Miller*, 177 S.W.3d at 687; *Kenney*, 760 S.E.2d at 440 n.9. The Vermont Supreme Court in *Harding* described the rule in terms similar to those used by the United States Supreme Court in *Mollison*, but the Vermont Court characterized insurance proceeds received by the plaintiff as "collateral" to any recovery from the wrongdoer:

The policy of insurance is collateral to the remedy against the defendant[] and was procured solely by the plaintiff and at his expense, and to the procurement of which the defendant was in no way contributory. It is in the nature of a wager between the plaintiff and the third person, the insurer, to which the defendant was in no measure privy, either by relation to the parties, or by contract, or otherwise. It cannot be said that the plaintiff took out the policy in the interest or behalf of the defendant, nor is there any legal principle which seems to require that it be ultimately appropriated to the defendant's use and benefit.

*Harding*, 43 Vt. at 538. After *Harding*, the principle eventually came to be known as the "collateral source rule."

Similar to the United States Supreme Court's rationale in *Mollison*, the Vermont Supreme Court in *Harding* rejected the defendant's argument that the collateral source rule would permit double recovery for plaintiffs, reasoning that the insurer would likely have subrogation rights. It explained that any recovery against the tortfeasor for amounts paid by insurance would "create[] an equity between the plaintiff and the insurer, to be ultimately adjusted between them, in which the defendant has no interest, and with which he has no concern." *Id.* at 539. Thus, the rationale for the rule was that insurance proceeds emanate from an agreement between the plaintiff and the insurer, wholly "collateral" to the defendant, so the defendant should not benefit from the plaintiff's receipt of proceeds "with which he has no concern." *Id.*

Over time, all fifty states, except perhaps Alabama, adopted some form of the collateral source rule. James L. Branton, *The Collateral Source Rule*, 18 St. Mary's L.J. 883, 883-84 (1987) (noting that, until legislative "abolitions of the [collateral source] rule, it was a part of the jurisprudence in every state"); Kevin S. Marshall, *The Collateral Source Rule and its Abolition: An Economic Perspective*, 15-FALL Kan. J.L. & Pub. Policy 57, 59 & n.28 (Fall 2005) (citing David Fellman, *Unreason in the Law of Damages: The Collateral Source Rule*, 77 Harv. L. Rev. 741, 742 (1964), and Alabama cases to demonstrate the exception in Alabama).

The Tennessee Supreme Court applied the rule espoused in both *Mollison* and *Harding* as early as 1896, though at that time it was not yet called the "collateral source rule." *Anderson v. Miller*, 33 S.W. 615, 617 (Tenn. 1896), *cited in Benson v. Tenn. Valley Elec. Coop.*, 868 S.W.2d 630, 640 (Tenn. Ct. App. 1993) (recognizing *Anderson*'s application of the collateral source rule); *see also Ill. Cent. R.R. Co. v. Porter*, 94 S.W. 666, 669-70 (Tenn. 1906), *cited in Hearn v. Boswell*, 1987 WL 5751, at *5 (Tenn. Ct.

App. Jan. 27, 1987) (recognizing *Porter*'s application of the collateral source). In *Anderson*, the plaintiffs sued the defendant in negligence for property damage from a fire; the plaintiffs had fully recovered for their property damage under their insurance policy. *Anderson*, 33 S.W. at 616. The defendant argued that the insurance company that covered the loss was actually the aggrieved party. The *Anderson* Court rejected this argument and held that the plaintiffs were the proper parties to bring the lawsuit. The Court described the plaintiffs' contract with their insurance company as unrelated to the defendant's obligation to the plaintiffs: "[The defendant] has no concern with any contract the plaintiff may have with any other party in regard to the goods, and *his rights or liabilities can neither be increased nor be diminished by the fact that such a contract exists*. He has no equities, as against the plaintiff, which can entitle him, under any circumstances, to an assignment of the plaintiff's policies of insurance." *Id.* (emphasis added) (quoting *Perrott v. Shearer*, 17 Mich. 48, 56 (1868)).

Ten years later, the Tennessee Supreme Court in *Porter* excluded evidence of gratuitous salary payments received by the plaintiff mail carrier when he missed work because of the defendant's negligence. *Porter*, 94 S.W. at 667-68. The defendant in *Porter* argued that evidence of the gratuitous payments was relevant to show that, in effect, the mail carrier did not "miss" work because he received his salary during his disability. The defendant contended: "[T]he object of the law is to make the plaintiff whole, and if he has lost nothing in a pecuniary sense, from his disability, he is not entitled to damages for loss of time [from work]." *Id.* at 668. The Court in *Porter* rejected this contention; it held that evidence of the gratuitous payments to the mail carrier was not admissible and should not reduce the railroad's liability. *Id.* at 669-70. The Court cited "the well-settled rule that money received on accident insurance policies by the injured persons does not diminish the amount of recovery against the wrongdoer." *Id.* at 670.

Since *Anderson* and *Porter*, the collateral source rule has become a familiar part of Tennessee jurisprudence. *See, e.g.*, *Nance*, 750 S.W.2d at 742; *Donnell v. Donnell*, 415 S.W.2d 127, 134 (Tenn. 1967), *abrogated on other grounds by Dupuis v. Hand*, 814 S.W.2d 340 (Tenn. 1991); *J&M, Inc. v. Cupples*, No. E2004-01328-COA-R3-CV, 2005 WL 1190704, at *3 (Tenn. Ct. App. May 20, 2005) (observing that the collateral source rule "has long been adopted in Tennessee"); *Fye*, 991 S.W.2d at 763 (noting that "[a]n injured party's right to recover his or her 'reasonable and necessary expenses' must be viewed in connection with the collateral source rule"); *Steele v. Ft. Sanders Anesthesia Grp., P.C.*, 897 S.W.2d 270, 282 (Tenn. Ct. App. 1994) ("The collateral source rule permits plaintiffs to prove and recover medical expenses, whether paid by insurance or not."); *Cherry v. McCullough*, No. 02A01-9201-CV-00005, 1992 WL 379074, at *6

(Tenn. Ct. App. Dec. 21, 1992) (noting that any payment the plaintiff receives from a collateral source is not normally "admissible in evidence and does not reduce or mitigate the defendant's liability" in tort cases).

The collateral source rule as applied in Tennessee and elsewhere is succinctly articulated in the widely-cited Section 920A of the Restatement (Second) of Torts:

> (1) A payment made by a tortfeasor or by a person acting for him to a person whom he has injured is credited against his tort liability, as are payments made by another who is, or believes he is, subject to the same tort liability.

> (2) Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.

Restatement (Second) of Torts Restatement (Second) of Torts § 920A (1977) (entitled "Effect of Payments Made to Injured Party"); *see Nance*, 750 S.W.2d at 742 ("[B]enefits received by a plaintiff from a source wholly independent of and collateral to the tortfeasor, as a result of the injury inflicted, will not diminish the damages otherwise recoverable from the defendant"); *Donnell*, 415 S.W.2d at 134 ("Normally, of course, in an action for damages in tort, the fact that the plaintiff has received payments from a collateral source, other than the defendant, is not admissible in evidence and does not reduce or mitigate the defendant's liability."); *Fye*, 991 S.W.2d at 763-64 (specifically adopting Section 920A as consistent with Tennessee law); *see also Holliday v. State*, W2014-02188-COA-R3-CV, 2015 WL 9255343, at *4-5 (Tenn. Ct. App. Dec. 16, 2015) (applying Section 920A, as adopted in *Fye*).

As can be seen in Section 920A, the collateral source rule has evolved as both a substantive rule of law and an evidentiary rule. Substantively, it affects the amount of damages that may be awarded against a defendant by prohibiting reduction of a plaintiff's recovery by benefits from sources unrelated to the tortfeasor. Comment *b* to section 920A ("Benefits from collateral sources") explains the policy reasons for the substantive aspect of the rule:

> b. Benefits from collateral sources. Payments made or benefits conferred by other sources are known as collateral-source benefits. They do not have the effect of reducing the recovery against the defendant. The injured party's net loss may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount there may be a double

- 14 -

compensation for a part of the plaintiff's injury. But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him. One way of stating this conclusion is to say that it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives. Compare § 924, Comment c (recovery for harm to earning capacity though plaintiff was on vacation), § 914A (recovery for damage to earning capacity ordinarily not reduced by amount of income tax that was not imposed).

Restatement (Second) Torts § 920A cmt. b. Thus, while application of the rule may at times result in compensation for the plaintiff that exceeds what he spent, collateral sources intended to benefit the injured party should not be shifted so as to become a benefit for the tortfeasor. The tortfeasor is held responsible for the harm he caused, regardless of the "net loss" of the injured party. *Id.*; *see Leitinger v. DBart, Inc.*, 736 N.W.2d 1, 10 (Wis. 2007) (noting that the purpose of the collateral source rule "is not to provide the injured person with a windfall, but rather to prevent the tortfeasor from escaping liability because a collateral source has compensated the injured person"); *Id.* at 8 ("'The tortfeasor . . . is not relieved of his obligation to the victim simply because the victim had the foresight to arrange, or good fortune to receive, benefits from a collateral source for injuries and expenses.'" (quoting *Ellsworth v. Schelbrock*, 611 N.W.2d at 764, 767 (Wisc. 2000))). The rule of law is also intended to promote tort deterrence. *See Bozeman*, 879 So. 2d at 699. According to the *Bozeman* Court, "tort deterrence has been an inherent, inseparable, aspect of the collateral source rule since its inception over one hundred years ago." *Id.*

The evidentiary component of the collateral source rule flows from the rule of law. If a plaintiff's recovery may not be reduced by collateral benefits, then "evidence that a plaintiff has received benefits or payments from a collateral source independent of the tortfeasor's procuration or contribution" must be excluded. *Bozeman*, 879 So. 2d at 699 (noting that "[t]he issue typically arises at trial following the submission of a Motion in Limine").

- 15 -

Comment *c* to Section 920A relates to the evidentiary component of the collateral source rule. This comment lists the type of benefits precluded by the collateral source rule: (1) insurance policies, whether maintained by the plaintiff or a third party, (2) employment benefits, either gratuitous or arising out of contract, (3) gratuities, and (4) social legislation benefits, such as social security benefits, welfare, and pensions. *Id.* § 920A cmt. c.[7]

As most commonly applied, the evidentiary rule bars "any evidence that all or part of a plaintiff's losses have been covered by insurance." *Wills*, 892 N.E.2d at 1022. One court has explained that evidence of insurance should not be presented to the jury "[b]ecause the likelihood of misuse by the jury clearly outweighs the probative value of evidence of collateral benefits." *Kenney*, 760 S.E.2d at 441. "The theory is 'that the jury may well reduce the damages based on the amounts that the plaintiff has been shown to have received from collateral sources.'" *Id.* (quoting *Ratlief v. Yokum*, 280 S.E.2d 584, 590 (W. Va. 1981)); *Loncar v. Gray*, 28 P.3d 928, 933 (Alaska 2001) ("The collateral source rule exclud[es] evidence of other compensation on the theory that such evidence

_____

[7] Comment *c* to Section 920A states:

c. The rule that collateral benefits are not subtracted from the plaintiff's recovery applies to the following types of benefits:

(1). Insurance policies, whether maintained by the plaintiff or a third party. Sometimes, as in fire insurance or collision automobile insurance, the insurance company is subrogated to the rights of the third party. This additional reason for keeping the tortfeasor's liability alive is not necessary, however, as the rule applies to insurance not involving subrogation, such as life or health policies.

(2). Employment benefits. These may be gratuitous, as in the case in which the employer, although not legally required to do so, continues to pay the employee's wages during his incapacity. They may also be benefits arising out of the employment contract or a union contract. They may be benefits arising by statute, as in worker's compensation acts or the Federal Employers' Liability Act. Statutes may subrogate the employer to the right of the employee, or create a cause of action other than by subrogation.

(3). Gratuities. This applies to cash gratuities and to the rendering of services. Thus the fact that the doctor did not charge for his services or the plaintiff was treated in a veterans hospital does not prevent his recovery for the reasonable value of the services.

(4). Social legislation benefits. Social security benefits, welfare payments, pensions under special retirement acts, all are subject to the collateral-source rule.

Restatement (Second) of Torts § 920A cmt. c.

would affect the jury's judgment unfavorably to the plaintiff on the issues of liability and damages." (internal quotations omitted)); *Proctor v. Castelletti*, 911 P.2d 853, 854 (Nev. 1996) (adopting *per se* rule barring admission of evidence of a collateral source of payment for any purpose because "[t]here is an ever-present danger that the jury will misuse the evidence to diminish the damage award"); *Jurgensen v. Smith*, 611 N.W.2d 439, 442 (S.D. 2000) (excluding collateral-source evidence "because of the danger that the jury may be inclined to . . . reduce a damage award, when it learns that plaintiff's loss is entirely or partially covered" (internal quotations omitted)).

From its early applications in Tennessee, the collateral source rule has been applied as both a substantive rule of law and a procedural rule of evidence.[8] *Porter*, 94 S.W. at 668 (applying the rule of evidence in addressing whether the trial court correctly admitted evidence of the gratuities); *Anderson*, 33 S.W. at 616 (applying the rule of law in deciding whether the plaintiff or the insurance company is the proper party to bring suit); *see also Donnell*, 415 S.W.2d at 134 ("Normally, of course, in an action for damages in tort, the fact that the plaintiff has received payments from a collateral source, other than the defendant, is not admissible in evidence and does not reduce or mitigate the defendant's liability."); *J&M*, 2005 WL 1190704, at *3 (noting that the collateral source rule is "a substantive rule of law that bars a tortfeasor from reducing damages owed to plaintiff by an amount the plaintiff received from sources that are collateral to the tortfeasor"); *Benson*, 868 S.W.2d at 640 ("Our courts have held that collateral source recoveries should not be the subject of a reduction for the defendants in a lawsuit." (citing *Simpson v. Allied Van Lines, Inc.*, 612 S.W.2d 172, 177 (Tenn. Ct. App. 1980)).

Although the collateral source rule is firmly embedded as part of American jurisprudence, a number of states have abrogated the rule to varying degrees. *See* Bryce Benjet, *A Review of State Law Modifying the Collateral Source Rule: Seeking Greater Fairness in Economic Damages Awards*, 76 Def. Couns. J. 210, 211 (Apr. 2009) ("Of the fifty States and the District of Columbia, forty-two jurisdictions have enacted and retained some form of statute that restricts the collateral source rule."); Paula Hearn Moore, et al., *Applying the Collateral Source Rule to Government Mandated Programs*, 15 J. Legal Econ. 31, 45 (April 2009) ("Out of the fifty (50) states, forty-four (44) states have taken legislative steps to minimize the effects of the collateral source rule."); Guillermo Gabriel Zorogastua, *Improperly Divorced From its Roots: The Rationales of the Collateral Source Rule and Their Implications for Medicare and Medicaid Write-*

---

[8] Other states have done the same. *See, e.g.*, *Wills v. Foster*, 892 N.E.2d 1018, 1022 (Ill. 2008); *Bozeman v. State*, 879 So. 2d 692, 699 (La. 2004); *Leitinger v. DBart, Inc.*, 736 N.W.2d 1, 7-8 (Wis. 2007); *Kenney v. Liston*, 760 S.E.2d 434, 441 (W. Va. 2014).

*Offs*, U. Kan. L. Rev. 463, 463 (Jan. 2007) ("Currently, only twelve states retain the rule's immaculate common[-]law form.").

Tennessee is among the states that have partially abrogated the collateral source rule in limited circumstances. In 1975, Tennessee's legislature enacted health care legislation that partially abrogated the collateral source rule in health care liability lawsuits. *Newton v. Cox*, 878 S.W.2d 105, 107 (Tenn. 1998); *see* Tenn. Code Ann. § 29-26-119 (2012).[9] The purpose of the overall legislation was to contain the cost of medical malpractice litigation and control the cost of health care. *Newton*, 878 S.W.2d at 107-08; *see Allied Waste N. Am., Inc. v. Lewis, King, Krieg & Waldrop, P.C.*, No. 3:13-00254, 2015 WL 1279579, at *12 (M.D. Tenn. Mar. 20, 2015) (noting that Tennessee has made a statutory exception to the collateral source rule only for medical malpractice cases); *Baker v. Vanderbilt Univ.*, 616 F. Supp. 330, 332-33 (M.D. Tenn. 1985) (upholding the constitutionality of Section 29-26-119); Tenn. Op. Atty. Gen. No. 12-58, 2012 WL 2153495, at *1 ("Damages in medical malpractice actions have been limited since 1975 by Tenn. Code Ann. § 29-26-119 which abrogates the collateral source rule."). Tennessee courts have also held that the collateral source rule does not apply to workers' compensation benefits, because applying the rule in such cases "would conflict with Tenn. Code Ann. § 50-6-204(a)(1) and would require legislative action to implement." *State Auto. Mut. Ins. Co. v. Hurley*, 31 S.W.3d 562, 566 (Tenn. Sp. Workers' Comp. App. Panel 2000). The collateral source rule has remained applicable in Tennessee in other personal injury cases.

Against this backdrop, we review our decision in *West* and consider its applicability in personal injury cases.

---

[9] That section of the health care liability statutes provides:

> In a health care liability action in which liability is admitted or established, the damages awarded may include (in addition to other elements of damages authorized by law) actual economic losses suffered by the claimant by reason of the personal injury, including, but not limited to, cost of reasonable and necessary medical care, rehabilitation services, and custodial care, loss of services and loss of earned income, but only to the extent that such costs are not paid or payable and such losses are not replaced, or indemnified in whole or in part, by insurance provided by an employer either governmental or private, by social security benefits, service benefit programs, unemployment benefits, or any other source except the assets of the claimant or of the members of the claimant's immediate family and insurance purchased in whole or in part, privately and individually.

Tenn. Code Ann. § 29-26-119 (2012).

- 18 -

## B. *West v. Shelby County Healthcare Corporation*

As they did in the lower courts, the Defendants argue that the holding in *West* regarding the definition of "reasonable" medical charges was intended to apply directly in personal injury litigation. This intent was signaled, they contend, by the *West* Court's choice of words, its observation that recovery for medical expenses in personal injury cases is also limited to expenses that are "reasonable and necessary," and *West*'s approving citation of cases from other jurisdictions holding that a medical provider's billing price is not necessarily representative of either the cost of the services or their value. *See West*, 459 S.W.3d at 45 (citing cases). For these reasons, the Defendants maintain that we should apply the *West* holding to the question of what medical charges are "reasonable" in personal injury tort litigation.

We begin our discussion of *West* by briefly describing the general billing practices of the defendant hospital in that case. The hospital in *West*, like many (but not all) medical providers,[10] engaged in the common practice of billing patients for medical services at full, undiscounted rates and then accepting a discounted amount from the patient's private insurance company.[11] *West*, 459 S.W.3d at 37; *see id.* (noting that the hospital has "two versions of its costs," one for the patient and one for the patient's insurance company). The difference between the full bill and the discounted amount is generally referred to as the "negotiated rate differential," or sometimes informally as a "write-off." *See* Lori A. Roberts, *Rhetoric, Reality, and the Wrongful Abrogation of the Collateral Source Rule in Personal Injury Cases*, 31 Rev. Litig. 99, *passim* (Winter 2012) (referring to the difference variously as either "negotiated rate differential" or "write-off"); *compare Howell v. Hamilton Meats & Provisions, Inc.*, 257 P.3d 1130, 1140 (Cal. 2011) (refusing to call the "negotiated rate differential" a "write-off" because the amount is not gratuitous), *with Kenney*, 760 S.E.2d at 438 (referring to the difference as "discounts or write-offs").

---

[10] As discussed below, any generalization about our health care system must be accompanied by disclaimers regarding the numerous exceptions. Here, we recognize that many medical providers accept only certain insurance carriers and that some choose not to accept insurance at all. In *West*, the defendant hospital accepted the insurance of both of the plaintiff patients and received payment from those insurance companies at negotiated, discounted rates. *West*, 459 S.W.3d at 38-39.

[11] The *West* Court specified that "[n]othing in [the] opinion should be construed to apply to hospital liens filed against patients who are TennCare enrollees." *West*, 459 S.W.3d at 39 n.2.

*West* arose under the Tennessee Hospital Lien Act (HLA), Tennessee Code Annotated section 29-22-101 to –107 (2012). *West*, 459 S.W.3d at 37. The HLA is implicated when a hospital provides treatment to a patient who was injured by someone else's negligence. In that situation, the HLA provides that the hospital "shall have a lien" on the patient's tort claim in the amount of "all reasonable and necessary charges for hospital care, treatment[,] and maintenance" of the patient.[12] Tenn. Code Ann. § 29-22-101(a). As a matter of practice, the hospital in *West* pursued recovery of a patient's full, undiscounted hospital bill from the third-party tortfeasor, even if insurance covered its bills at a discounted rate. *West*, 459 S.W.3d at 37. After the patient's insurer paid the hospital at the discounted rate, the hospital did not release its lien; it continued its efforts to recover the full bill from the third-party tortfeasor. *Id.* at 37-38. If the hospital recovered the amount of the full, undiscounted bill from the tortfeasor, it would reimburse the discounted amount to the insurance company and retain the negotiated rate differential. Only then would the hospital release its statutory lien. *Id.* at 38.

The plaintiffs in *West* were two hospital patients whose injuries were caused by someone else's negligence. In accordance with the above-described practice, the hospital asserted a lien under the HLA for the full, undiscounted amount of the plaintiffs' hospital bills. *Id.* at 38-39. The plaintiffs sued the hospital, seeking to quash the lien and recover damages. They argued that the hospital's standard practice amounted to unlawful

---

[12] Tennessee Code Annotated section 29-22-101 provides in relevant part:

> (a) Every person, firm, association, corporation, institution, or any governmental unit, including the state of Tennessee, any county or municipalities operating and maintaining a hospital in this state, *shall have a lien for all reasonable and necessary charges for hospital care, treatment and maintenance* of ill or injured persons upon any and all causes of action, suits, claims, counterclaims or demands accruing to the person to whom such care, treatment or maintenance was furnished, or accruing to the legal representatives of such person in the case of such person's death, on account of illness or injuries giving rise to such causes of action or claims and which necessitated such hospital care, treatment and maintenance.

> (b) The hospital lien, however, shall not apply to any amount in excess of one third (⅓) of the damages obtained or recovered by such person by judgment, settlement or compromise rendered or entered into by such person or such person's legal representative by virtue of the cause of action accruing thereto.

Tenn. Code Ann. § 29-22-101(a), (b) (emphasis added).

- 20 -

"balance billing"[13] in that the hospital was "receiving payment from its patients' insurance companies while, at the same time, perfecting a hospital lien for the full, unadjusted amount of the cost of the medical services provided." *Id.* at 39.

At the outset of its analysis, the Court stated: "This appeal requires us to interpret and apply the statutes governing hospital liens." *Id.* at 41. To resolve the issue on appeal, the Court said, it would address three matters: "First, . . . the general nature of statutory liens. Second, . . . the . . . purpose of the liens authorized by the HLA. Finally, we will construe the provisions of the HLA that are relevant to this dispute, and then apply these provisions to the facts of this case." *Id*. at 42. Thus, *West* clearly described its analysis as an interpretation of the HLA.

After reviewing the nature of statutory liens and the background of the HLA, *West* stated the premise for its interpretation of the HLA. Although "the HLA serves the same purpose as health insurance," the Court observed, "a debt owed by a patient to a hospital is the foundation of a lien under the HLA. Thus, *the lien can exist only as long as the patient owes a debt to the hospital*." *Id*. at 43 (emphasis added). In other words, the Court held that the "reasonable charges" under the HLA could not exceed what the patient was required to actually pay the hospital. *Id.*

Based on this premise, *West* characterized the issue before it. Under Section 29-22-101(a), an HLA lien is for the hospital's "reasonable and necessary charges." In light of its discussion of liens and the purpose of the HLA, the *West* Court framed the issue on appeal as whether "reasonable charges" under Section 29-22-101(a) are (1) the hospital's full, undiscounted bills, or (2) the discounted amount paid by the patients' private insurance. *Id.* at 43-44. Choosing between the two, *West* ultimately held that "reasonable charges" for purposes of the HLA are the discounted amounts that a hospital agrees to accept from the patient's private insurer. *Id.* at 45-46.

---

[13] The Court in *West* explained that "'[b]alance billing' commonly refers to the practice by which a health care provider bills a patient for the balance of its charges or fees over and above the amount that the insurance company has agreed to pay as a reasonable charge." *West*, 459 S.W.3d at 39 n.4 (citing Carolyn R. Cody, *Professional Licenses and Substantive Due Process: Can States Compel Physicians to Provide Their Service?*, 22 Wm. & Mary Bill Rts. J. 941, 954 (2014)); *see also River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc.*, 173 S.W.3d 43, 55-56 (Tenn. Ct. App. 2002) (referring to balance billing as "the practice of the [medical] provider billing the [TennCare managed care organization] enrollee for any amount charged by the provider but not paid by" the managed care organization and noting that Tenn.Code Ann. § 56-32-205(c) "requires that TennCare provider contracts include a clause prohibiting billing the [TennCare managed care organization] enrollee for anything except 'reasonable copayment and uncovered expenses.'").

The Court in *West* gave two reasons for its conclusion. First, the Court observed, the amount of the hospital's full, undiscounted "charges is unreasonable because it does not 'reflect what is [actually] being paid in the market place.' Because 'virtually no public or private insurer actually pays full charges[,] . . . [a] more realistic standard is what insurers actually pay and what the hospitals [are] willing to accept.'" *Id.* at 44-45 (quoting *What's the Cost?: Proposals to Provide Consumers with Better Information about Healthcare Service Costs: Hearing Before the Subcomm. on Health of the House Comm. on Energy and Commerce*, 109th Cong. 99 (2006) (statement of Dr. Gerard Anderson, Professor, Bloomberg School of Public Health & School of Medicine at Johns Hopkins University; Director, Johns Hopkins Center for Hospital Finance and Management)). The Court also cited the hospital's agreement with the patients' private insurers to accept the discounted charges as full payment. For these reasons, the Court held, "with regard to an insurance company's customers, 'reasonable charges' [under the HLA] are the charges agreed to by the insurance company and the hospital," i.e., the discounted amounts actually accepted by the hospital as defined in its contract with the patient's private insurance company. *Id.* at 44-46.

In sum, *West* began with the postulate that the HLA lien "can exist only as long as the patient owes a debt to the hospital." *Id.* at 43. *West* then stated the question of statutory interpretation as a choice between two options, the full, undiscounted bill sent to the patient or the discounted bill paid by the insurer. Once the question was framed in this manner, given the hospital's agreement not to pursue the patient for the negotiated rate differential, the choice between the two options became inevitable. Thus, *West* held that the hospital had no authority "to maintain its lien after the patients' insurance company paid the adjusted bill." *Id.* at 37.

As noted by the Court of Appeals below, *West* specifically limited its holding to application of the HLA. *See Dedmon*, 2016 WL 3219070, at *9 (noting that *West* was specifically limited in application "for the purpose of Tenn. Code Ann. § 29-22-101(a)" (quoting *West*, 459 S.W.3d at 44)); *see also West,* 459 S.W.3d at 39 n.2 ("Nothing in [the] opinion should be construed to apply to hospital liens filed against patients who are TennCare enrollees."). The collateral source rule was not argued or even mentioned in *West*.

Despite these disclaimers, overly broad language in *West*—to the effect that full, undiscounted medical bills are not "reasonable charges" for purposes of the HLA— spawned some confusion. Some courts surmised that this Court would hold the same with respect to "reasonable medical expenses" recoverable in generic personal injury

cases.[14]  These courts held that the discounted medical bills accepted by the plaintiffs' medical providers were, as a matter of law, the reasonable medical expenses, and they excluded evidence of the patients' full, undiscounted medical bills.[15]  Noting that *West* cited the California Supreme Court's decision in *Howell v. Hamilton Meats & Provisions, Inc.*, 257 P.3d 1130, 1133 (Cal. 2011), many of those courts followed the reasoning in *Howell*, in which the California Court held that, although "[t]he collateral-source rule precludes certain deductions against otherwise recoverable damages," it "does not expand the scope of economic damages to include expenses the plaintiff never incurred."[16] *Howell*, 257 P.3d at 1133.

Other courts recognized that the *West* holding was limited to application of the HLA and held that the collateral source rule prevents the admission into evidence of insurance benefits in personal injury cases.[17]  Like the Court of Appeals below, those courts identified differences between HLA cases and personal injury cases, and they held that the collateral source rule applied to prevent the admission into evidence of insurance benefits in personal injury cases.[18]

---

[14] At least six Tennessee federal district courts—and the trial court in this case—came to this conclusion.  *Pacheco v. Johnson*, No. 3:11-cv-00221; 2017 WL 3188429, at *3 (M.D. Tenn. July 27, 2017); *Cone v. Hankook Tire Co.*, No. 14-1122, 2017 WL 401795, at *5-6 (W.D. Tenn. Jan. 25, 2017); *Johnson v. Trans-Carriers, Inc.*, No. 2:15-cv-2533-STA-dkv, 2017 WL 28004, at *2 (W.D. Tenn. Jan. 3, 2017); *Smith v. Lopez-Miranda*, 165 F. Supp. 3d 689, 691 (W.D. Tenn. 2016); *Hall v. USF Holland, Inc.*, 152 F. Supp. 3d 1037, 1040 (W.D. Tenn. Jan. 12, 2016); *Keltner v. United States*, No. 2:13-cv-2840-STA-dkv, 2015 WL 3688461, at *4 (W.D. Tenn. June 12, 2015).

[15] *See Pacheco*, 2017 WL 3188429, at *3 (relying on *West* and rejecting the Court of Appeals decision below); *Cone*, 2017 WL 401795, at *6 (same); *Johnson*, 2017 WL 28004, at *2-3 (same); *Smith*, 165 F. Supp. 3d at 692 (reasoning that the decision does not conflict with the collateral source rule); *Hall*, 152 F. Supp. 3d at 1040 (same); *Keltner*, 2015 WL 3688461, at *4 (same).

[16] *See Johnson*, 2017 WL 28004, at *2 & nn.14, 15 (quoting *Keltner*, 2015 WL 3688461, at *4, which quoted *Howell*, 257 P.3d at 1133); *Smith*, 165 F. Supp. 3d at 693 (same); *Hall*, 152 F. Supp. 3d at 1040 & n.4 (same, and finding significant that the *West* Court cited *Howell* in its analysis, 459 S.W.3d at 45); *Keltner*, 2015 WL 3688461, at *4 (finding the reasoning in *Howell* persuasive).

[17] *See Barnes v. Malinak*, No. 3:15-cv-556, 2017 WL 3687320, at *2 (E.D. Tenn. Aug. 25, 2017) (relying on the Court of Appeals decision below); *Boettcher v. Shelter Mutual*, No. 2:14-cv-02796-JPM-dkv, 2016 WL 3212184, at *3 (W.D. Tenn. June 8, 2016) (same); *Ryans v. Koch Foods, LLC*, No. 1:13-cv-234-SKL, 2015 WL 11108908, at *1-2 (E.D. Tenn. Aug. 5, 2015).

[18] *Barnes*, 2017 WL 3687320, at *1 ("Evidence that some medical charges were written off, then, is squarely barred by the collateral-source rule."); *Boettcher*, 2016 WL 3212184, at *3 (noting that "[t]he *Keltner*, *Hall*, and *Smith* decisions did not consider, however, the presumption of reasonableness that

We now clarify that our holding in *West* was not intended to apply in personal injury cases. *West* was intended only to construe the phrase "reasonable charges" in the context of determining the maximum amount of a hospital's HLA lien. Certainly there is some overlap in that the word "reasonable" is used in connection with the valuation of medical expenses in many types of cases, such as those based on work-related injuries, medical malpractice injuries, and generic personal injuries. *West*, 459 S.W.3d at 44. However, those types of claims involve different public policies than the policies underlying the HLA, and they are governed by different statutory schemes and common-law rules. *See, e.g.*, *id.* (noting that the presumption in Section 24-5-113(a) does not apply in the HLA case because the statute applies only to personal injury actions); *Hurley*, 31 S.W.3d at 566 (noting the "inherent differences between a tort claim for personal injury and a claim for workers' compensation benefits"). *West* interpreted the HLA in a manner consistent with the Legislature's intent and purpose for *that statute*. *West*, 459 S.W.3d at 41 (noting that the HLA must be construed in a manner that would not "frustrate the General Assembly's purpose in creating the lien"). Application of the *West* holding to personal injury cases would transform what would be a factual finding on damages into a legal holding by the court. *See Dedmon*, 2016 WL 3219070, at *10 ("Defendants' proposed expansion of *West* would create a new system that allows the amount accepted by medical providers in satisfaction of the bills to be deemed reasonable as a matter of law."). *West* posed the question under the HLA as deciding between two choices—either the full bills or the discounted amounts accepted by the hospital—and ultimately decided that the discounted amounts paid by the insurance company were the maximum "reasonable charges" under Section 29-22-101(a) *as a matter of law. West*, 459 S.W.3d at 44 ("[W]e must decide which version of the [hospital's] costs is the reasonable cost for the purpose of Tenn. Code Ann. § 29-22-101(a)."). In contrast, in personal injury cases, the value of a plaintiff's "reasonable medical expenses" is a fact question to be decided by the trier of fact, based on the evidence submitted by both parties. *See Meals*, 417 S.W.3d at 419 ("We entrust the responsibility of resolving questions of disputed fact, including the assessment of damages, to the jury."); *Coakley v. Daniels*, 840 S.W.2d 367, 372 (Tenn. Ct. App. 1992) ("The amount allowable as compensation for personal injuries are not measured by fixed rules of law, but rest largely in the discretion of the trier of fact . . . .").

---

arises under the procedure of [S]ection 24-5-113(b)"); *Ryans*, 2015 WL 11108908, at *1-2 ("The Court is not persuaded that the Tennessee Supreme Court intended its decision in *West* to alter or abolish Tennessee's longstanding collateral source rule as articulated in *Fye* [*v. Kennedy*, 991 S.W.2d 754 (Tenn. Ct. App. 1998)].").

Importantly, as noted by the Court of Appeals below, the collateral source rule and the presumption statute (Section 24-5-113) are both applicable in personal injury cases. Neither was implicated in our analysis in *West*.

For all of these reasons, our holding in *West* is not directly applicable in personal injury cases. We reject the Defendants' argument that *West* created a new legal standard for defining "reasonable medical charges" in personal injury cases.

### C. Full Bills vs. Discounted Insurance Payments

In the alternative, even if *West* is not directly applicable in personal injury cases, the Defendants argue that concepts from *West* should nevertheless be applied here. The Defendants and Amicus Tennessee Defense Lawyers Association ask this Court to take the opportunity to recognize the realities of our current health care system, particularly the growing disparity between what medical providers charge for their services and what they will accept. In light of this changed environment, they urge the Court to adopt the law in jurisdictions that have chosen to limit the recovery of personal injury plaintiffs to the discounted amounts medical providers accept from insurers in payment for medical services. *See Dedmon*, 2016 WL 3219070, at *10 (recognizing the breadth of the Defendants' argument). That is, the Defendants argue that plaintiffs' recovery of "reasonable medical expenses" in personal injury cases should be limited to the discounted amounts accepted by medical providers. They contend that the collateral source rule does not apply and so it does not preclude such a holding.

As outlined above, the collateral source rule has been the law in Tennessee since 1896. *See Anderson*, 33 S.W. at 617. The rule has served important public policies, namely, that a tortfeasor's responsibility is to compensate for all the harm he causes, not limited to the net loss that the injured party receives, and that a benefit directed to the injured party should not become a windfall for the tortfeasor. Nevertheless, we recognize that the law must change "when necessary to serve the needs of the people." *Powell v. Hartford Accident & Indem. Co.*, 398 S.W.2d 727, 732 (Tenn. 1966). "Where the reason fails the rule should not apply." *Brown v. Selby*, 332 S.W.2d 166, 169 (Tenn. 1960). We will consider the Defendants' arguments in light of these principles.

We agree with the Defendants and the Amicus Tennessee Defense Lawyers Association that health care has undergone tremendous changes since Tennessee adopted the collateral source rule. During that time, the types of collateral benefits potentially

- 25 -

available to plaintiffs have multiplied. In addition to the insurance and gratuitous payments that were the subject of *Anderson* and *Porter*, in the current environment, plaintiffs in personal injury cases may have received benefits from unions, Social Security, TennCare, Medicaid, Medicare or other social legislation. They may have received treatment free at a veterans' facility or at a reduced rate at a charity-affiliated provider. *See* Restatement (Second) of Torts § 920A cmt. c. All of these sources would qualify as collateral benefits potentially subject to the collateral source rule.

During this same period since adoption of the rule, the pricing, payment, and reimbursement system for health care providers has become exponentially more complex. "The rise of managed care organizations" has distorted pricing for health care services, as the deep discounts demanded by the MCOs require providers to offset those discounts by charging higher prices to other patients. *Howell v. Hamilton Meats & Provisions, Inc.*, 257 P.3d 1130, 1141 (Cal. 2011). Some social legislation benefits eschew the traditional fee-for-service model in favor of pool payments or a set "capitation" amount for all treatment of a single patient. *River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc.*, 173 S.W.3d 43, 48 (Tenn. Ct. App. 2002). Hospitals are often legally required to provide treatment for patients who either are insured by companies with whom the hospital has no contractual relationship or who have no insurance at all. *See Chattanooga-Hamilton Cty. Hosp. Auth. v. United Healthcare Plan of the River Valley, Inc.*, 475 S.W.3d 746, 750 (Tenn. 2015) (referencing federal statutes prohibiting "patient dumping"); *River Park Hosp.*, 173 S.W.3d at 48 (referencing same federal statute). In all, providers are "faced with competing objectives of balancing budgets, remaining competitive, complying with health care and regulatory standards, and continuing to offer needed services to the community." *Howell*, 257 P.3d at 1141 (quoting a 2005 study of hospital cost setting conducted for the Medicare Payment Advisory Commission). In this complicated environment, charges by hospitals have come to be "set within the context of hospitals' broader communities, including their competitors, payers, regulators, and customers." *Id.*; *see also River Park Hosp.*, 173 S.W.3d at 48. Funding the required treatment of patients without the means to fully pay for care "depends on the ability of providers to disproportionately charge various patient categories." Christopher W. Blaylock, *The Vital Role of the Collateral Source Rule in United States Healthcare Financing*, 36 U. La Verne L. Rev. 1, 14 (2014).

Of significance in this appeal, one result of the increasing complexity of health care has been a widening of the gap between a medical provider's standard rate charged to uninsured patients and the amounts accepted from insurance or social legislation benefits. *See e.g., West*, 459 S.W.3d at 37 (noting that medical providers have "two versions of [their] costs"); *River Park Hosp.*, 173 S.W.3d at 49 (out-of-network provider

insisted on insurance company paying "standard" rates for patients it was required to treat while insurance company insisted on paying much lower "in-network" rates); *Fye*, 991 S.W.2d at 762 (medical providers accepted approximately 10% of undiscounted hospital bill from Medicaid as full payment).

As observed by the Court of Appeals below, all of these developments have caused "the issue of what constitutes a reasonable medical charge or expense [to become] the subject of increased litigation due to the increased involvement of government payors, the complexity of health care reimbursement provisions, financial pressures on hospitals, and the significance of medical expense recovery in personal injury litigation." *Dedmon*, 2016 WL 3219070, at *5 (citing Michael K. Beard & Dylan H. Marsh, *Arbitrary Healthcare Pricing & the Misuse of Hospital Lien Statutes by Healthcare Providers*, 38 Am. J. Trial Advoc. 255, 272-73 (2014)). Courts across the country have struggled to understand health care systems and to facilitate personal injury damage awards that are fair to both plaintiff and defendant.[19] *See, e.g., Stanley v. Walker*, 906 N.E.2d 852, 857 (Ind. 2009) (noting that the complexities of health care make it difficult to determine the reasonable value of medical services).

Even though "the collateral source rule has been firmly entrenched in the American jurisprudence of the law of damages for over a century," *see* Nora J. Pasman-Green & Ronald D. Richards, Jr., *Who Is Winning the Collateral Source War? The Battleground in the Sixth Circuit States,* 31 U. Tol. L. Rev. at 425 (Spring 2000), the changed circumstances in health care have prompted reconsideration of the rule in many jurisdictions. As background for our analysis, we will review the approaches taken in other jurisdictions. The decisions in other jurisdictions are sometimes dictated by statute, sometimes developed through a combination of statute and the common law, and sometimes developed solely through the common law. Some jurisdictions do not have a clear view, and others have taken inconsistent approaches depending on the facts involved or the court rendering the decision. In any event, a review of the national landscape will lend perspective to our analysis of the issues presented in this appeal.

---

[19] Much of the information upon which courts have relied to describe the complexities of our health care system and the disparity between full bills and discounted payments has come from commentators. *See Stanley*, 906 N.E.2d at 863 n.3 (Dickson, J., dissenting) (noting that the majority, the concurrence, and the dissent all relied on sources outside the record in their analysis). From our review, most commentary appears written to further an agenda, on both ends of the spectrum, and it is a challenge for courts to find neutral information.

We first recognize the impact of legislation in this arena. From our review, state statutes regarding the collateral source rule lack any uniformity whatsoever. As noted above, a number of states have abrogated the collateral source rule to some degree by statute,[20] usually as a part of broader tort reform legislation.[21] Some statutes specify that the rule is to remain intact for some purposes but not for other purposes.[22] Other statutes allow plaintiffs to submit full, undiscounted bills to prove their reasonable medical expenses but permit the trial court to reduce the jury's verdict after trial based on amounts the plaintiff received from collateral sources.[23] Some statutes are interpreted as

[20] Courts in at least two of those states have held statutes abrogating the collateral source rule to be unconstitutional, a violation of the separation of powers doctrine. *See, e.g.*, *Johnson v. Rockwell Automation, Inc.*, 308 S.W.3d 135, 142 (Ark. 2009) (holding an Arkansas statute unconstitutional when it restricted evidence of damages to discounted amounts because rules of evidence are within the province of the courts); *O'Bryan v. Hedgespeth*, 892 S.W.2d 571, 576 (Ky. 1995) ("Responsibility for deciding when evidence is relevant to an issue of fact which must be judicially determined, such as the medical expenses incurred for treatment of personal injuries, falls squarely within the parameters of "practice and procedure" assigned to the judicial branch by the separation of powers doctrine and [the Kentucky Constitution]."); *see also Denton v. Con-Way S. Exp., Inc.*, 402 S.E.2d 269, 272 (Ga. 1991) (holding Georgia's collateral-source statute violated various provisions of the Georgia Constitution), *abrogated on other grounds by Grissom v. Gleason*, 418 S.E.2d 27 (Ga. 1992).

[21] Texas enacted its collateral-source statute "as part of a wide-ranging package of tort-reform measures." *Haygood v. DeEscabedo*, 356 S.W.3d 390, 391 (Tex. 2011) (citing Tex. Civ. Prac. & Rem. Code § 41.0105). It limits a plaintiff's recovery to the discounted amounts paid by insurance as a matter of law. *Id.* at 396 ("[W]e hold that the common-law collateral source rule does not allow recovery as damages of medical expenses a health care provider is not entitled to charge."); *see also* Mo. Rev. Stat. § 490.715 (2016) (stating that the plaintiff may only introduce evidence of "actual cost" paid for services); Okla. Stat. tit. 12 § 3009.1 (2011 & Supp. 2016) (limiting recovering to actual amount paid for medical services).

[22] North Dakota has abrogated the collateral source rule for some collateral-source benefits, but it applies a "private insurance" exception in order "to encourage people to secure personal insurance." *Dewitz v. Emery*, 508 N.W.2d 334, 340 (N.D. 1993) (discussing N.D. Cent. Code § 32-03.2-06); *see also White v. Jubitz Corp.*, 219 P.3d 566, 579-80 (Or. 2009) (applying Or. Rev. Stat. § 31.580, which generally adheres to the collateral source rule as stated in the Restatement (Second) of Torts § 920A, but allows a post-trial reduction of damages in some situations). Like Tennessee, some states have abrogated the collateral source rule to some extent in health care liability legislation. *See, e.g.*, Ariz. Rev. Stat. Ann. § 12-565 (2016); Me. Rev. Stat. tit. 24 § 2906 (2016); Md. Code Ann. Cts. & Jud. Proc. § 10-104 (LexisNexis 2013 & Supp. 2017); Wis. Stat. § 893.55(7) (2015-16); W. Va. Code Ann. § 55-7B-9a (LexisNexis 2016); Utah Code Ann. § 78B-3-405 (2012).

[23] Colorado and Idaho permit the trial court to reduce the plaintiff's verdict after trial. *See* Colo. Rev. Stat. § 13-21-111.6 (2017); Idaho Code Ann. § 6-1606 (2010 & Supp. 2017). Other state statutes do the same, but they also permit the plaintiff to submit proof of amounts they may have paid for the

supporting a so-called "hybrid" method; they allow the jury to consider evidence of both the plaintiff's full, undiscounted bills and also the discounted amounts in order to assess the reasonableness of the plaintiff's medical expenses.[24]

In this appeal, we are asked to modify Tennessee's common law regarding the collateral source rule.[25] Consequently, we focus our review on courts that have addressed the collateral source rule based on the common law.

Under the common law, courts in other jurisdictions have developed a variety of approaches to the role of the collateral source rule in awarding damages in personal injury lawsuits. These approaches have been grouped into three categories: (1) actual amount paid, (2) benefit of the bargain, and (3) reasonable value. *See, e.g.*, *Stayton v. Del. Health Corp.*, 117 A.3d 521, 527 (Del. 2015); *Wills*, 892 N.E.2d at 1025; *Bozeman*, 879 So. 2d at 701. We will discuss each approach.

A minority of courts follow the "actual amount paid" approach urged by the Defendants in this appeal. The "actual amount paid" approach limits a plaintiff's recovery to the amount actually paid to the medical provider, either by insurance or otherwise. *See Wills*, 892 N.E.2d 1018, 1025-26. Courts following this approach generally seek to avoid allowing plaintiffs any so-called "windfall" from tortfeasors. *Id.* They take the position that limiting plaintiffs' recovery to the amount paid to the medical

---

insurance, i.e., premiums. Alaska Stat. § 09.17.070 (2016); Conn. Gen. Stat. § 52-225a (2017); Fla. Stat. § 768.76 (2017), Mich. Comp. Laws Ann. § 600.6303 (West 2000 & Supp. 2017); Minn. Stat. § 548.251 (2016); Neb. Rev. Stat. § 44-2819 (2010); N.J. Stat. Ann. § 2A:15-97 (2000), *abrogated on other grounds*, *Levine v. United Healthcare Corp.*, 402 F.3d 156 (3d Cir. 2005); N.Y. C.P.L.R. 4545 (McKinney 2007 & Supp. 2017).

[24] Indiana statutes support the "hybrid" method. *See Stanley v. Walker*, 906 N.E.2d 852, 856-57 (Ind. 2009) (interpreting Ind. Code § 34-44-1-2); *see also Crocker v. Grammer*, 87 So. 3d 1190 (Ala. 2011) (interpreting Ala. Code. 1975 § 12-21-45); *Jaques v. Manton*, 928 N.E.2d 434, 438 (Ohio 2010) (interpreting Ohio Rev. Code Ann. § 2315.20). Iowa's statute allows a plaintiff to seek recovery of his full, undiscounted medical bills, provided that they are supported by expert testimony, but it also allows evidence of discounted amounts to rebut the plaintiff's expert testimony on the reasonableness of those bills. *See Pexa v. Auto Owners Ins. Co.*, 686 N.W.2d 150, 156 (Iowa 2004) (interpreting Iowa Code § 668.14 (1999)).

[25] As we have indicated, Tennessee has abrogated the collateral source rule through legislation only in health care liability cases and workers' compensation cases, neither of which is at issue in this appeal. *See* Tenn. Code Ann. § 29-26-119 (health care liability); *Hurley,* 31 S.W.3d at 566 (workers' compensation).

provider is not contrary to the collateral source rule because the rule is not implicated. When insurance payments are used to compensate the plaintiff's medical providers, they reason, limiting the plaintiff's recovery to only the amount actually paid by the insurance company to the medical provider simply permits the plaintiff to recover no more than he has expended.

The leading case on the "actual amount paid" approach is *Howell v. Hamilton Meats & Provisions, Inc.*, 257 P.3d 1130 (Cal. 2011), which was cited in *West*. According to the view expressed in *Howell*, the negotiated rate differential is not an expense "incurred" by the plaintiff, because neither the plaintiff nor the plaintiff's insurer will be expected to pay it. The differential is not an insurance benefit to the plaintiff; it is instead a benefit to the insurer that results from the insurer's negotiations with medical providers:

> [P]laintiff did not incur liability for her providers' full bills, because at the time the charges were incurred the providers had already agreed on a different price schedule . . . . Having never incurred the full bill, plaintiff could not recover it in damages for economic loss. For this reason alone, the collateral source rule would be inapplicable. The rule provides that "if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the *damages which the plaintiff would otherwise collect from the tortfeasor*." The rule does not speak to losses or liabilities the plaintiff did not incur and would not otherwise be entitled to recover. . . .
>
> The negotiated rate differential lies outside the operation of the collateral source rule also because it is not primarily a benefit to the plaintiff and, to the extent that it does benefit the plaintiff, it is not provided as "compensation for [the plaintiff's] injuries." Insurers and medical providers negotiate rates in pursuit of their own business interests, and the benefits of the bargains made accrue directly to the negotiating parties. The primary benefit of discounted rates for medical care goes to the payer of those rates—that is, in largest part, to the insurer.

*Id.* at 1143-44 (citations omitted). *Howell* indicated, with little explanation, that the Court would not follow the same approach in cases where a plaintiff received donated medical services or the benefit of charitable aid. *Id*. at 1140. It did not address cases involving other benefits, such as social legislation benefits (e.g., veterans' benefits), or those in which the medical debt was written off because the uninsured plaintiff was

unable to pay. The *Howell* Court shrugged off the fact that, under its ruling, "[a] tortfeasor who injures a member of a managed care organization may pay less in compensation for medical expenses than one who inflicts the same injury on an uninsured person treated at a hospital," commenting only that "[f]ortuity is a fact in life and litigation." *Id.* at 1145 (quoting the defendant's position).

Few other courts have chosen to follow this approach. Where they have, the result is often dictated to some extent by statute. *See Dyet v. McKinley*, 81 P.3d 1236 (Idaho 2003) (holding that Medicare write-offs are not a collateral source and cannot be recovered), *abrogated on other grounds by Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 81 P.3d 1236, 1238-39 (Idaho 2011); *Haygood v. DeEscabedo*, 356 S.W.3d 390, 395 (Tex. 2011) (same, and holding "that the common-law collateral source rule does not allow recovery as damages of medical expenses a health care provider is not entitled to charge"); *Moorhead v. Crozer Chester Med. Ctr.*, 765 A.2d 786, 791 (Pa. 2001) (same, and holding that the collateral source rule does not apply to the "illusory" part of the medical bill), *abrogated on other grounds in Northbrook Life Ins. Co. v. Commonwealth*, 949 A.2d 333, 337 (Pa. 2008).

The "actual amount paid" approach as articulated in *Howell* has been the subject of criticism. The *Howell* reasoning—that the collateral source rule is inapplicable to third-party payment of the plaintiff's medical debts but is still in force for third-party forgiveness of the same debt—has been called "schizophrenic" and "incoherent." *McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164, 1170-71 (D. Nev. 2014). It is also criticized because of the disparity that results in cases where the victim is insured as opposed to those where the victim is uninsured. As acknowledged by the Court in *Howell*, the tortfeasor's liability is reduced when the victim is prudent and buys insurance, but it is increased when the victim has no insurance. *See Bozeman*, 879 So. 2d at 703. As one court noted, reducing an insured plaintiff's recovery by the negotiated rate differential "overlooks the fundamental purpose of the [collateral source] rule, . . . to prevent a tortfeasor from deriving any benefit from compensation or indemnity that an injured party has received from a collateral source." *Acuar v. Letourneau*, 531 S.E.2d 316, 322 (Va. 2000).

The next approach, the "benefit-of-the-bargain" approach, permits recovery of full, undiscounted medical bills, including the negotiated rate differential, only where the plaintiff paid consideration for the insurance benefits. *Id.* at 322-23. Under this approach, when the plaintiff is privately insured, the negotiated rate differential is considered to be "as much of a benefit for which [the plaintiff] paid consideration as are the actual cash payments made by his health insurance carrier to the health care

- 31 -

providers." *Id.* at 322. However, courts that follow this approach do not allow plaintiffs to recover the amount of their full bills if they did not pay for the benefit of discounted rates and write-offs. *Id.*; *see Bozeman*, 879 So. 2d at 705 (allowing a plaintiff to recover only what Medicaid paid "because no consideration [was] provided for the benefit"); *Stayton v. Del. Health Corp.*, 117 A.3d 521, 531 (Del. 2015) (holding that the collateral source rule does not apply to write-offs for Medicare patients, although it does in other cases). The "benefit of the bargain" approach seeks to encourage the purchase of insurance and reward those who exercise prudence and pay for an insurance policy. *See Helfend v. S. Cal. Rapid Transit Dist.*, 465 P.2d 61, 66 (Cal. 1970).

The "benefit of the bargain" approach has been criticized as protecting the rich and hurting the poor, since persons who have the ability to pay for insurance are the only personal injury plaintiffs who may recover the negotiated rate differential. Stated another way, this approach promotes "inherent discrimination among beneficiaries from different programs and insurance companies." Zorogastua, 55 U. Kan. L. Rev. at 492. Another criticism of the "benefit of the bargain" approach is that it "undermines the collateral source rule by using the plaintiff's relationship with a third party to measure the tortfeasor's liability."[26] *Wills*, 892 N.E.2d at 1027; *see also Leitinger*, 736 N.W.2d at 10 ("The collateral source rule ensures that the liability of similarly situated defendants is not dependent on the relative fortuity of the manner in which each plaintiff's medical expenses are financed.").

The third general approach may be called the "reasonable value" approach, with a proviso that courts have defined "reasonable value" in different ways. Under the reasonable value approach, plaintiffs may recover the "reasonable value" of their medical expenses, regardless of whether the plaintiff is privately insured. As explained below, of the courts that use the "reasonable value" approach, a minority defines "reasonable value" as the actual amount paid, while a majority holds that the "reasonable value" can be the plaintiff's full, undiscounted medical bills. A few courts use a "hybrid" method, allowing the trier of fact to consider both the actual amount paid and the full bill in determining the "reasonable value" of medical services provided to the plaintiff. *Id.* at 1027-28.

---

[26] The "benefit of the bargain" approach is contrary to language in Section 920A of the Restatement (Second) of Torts stating that "there is no reason to differentiate between a payment from a collateral source and a gratuity from a collateral source."

The few courts that define "reasonable value" as the amount accepted by medical providers have generally used reasoning based on comment h to Section 911 of the Restatement (Second) of Torts, which focuses on the exchange value of property or services,[27] instead of Section 920A (collateral source rule). *Id.* at 1027; *see Bynum v. Magno*, 101 P.3d 1149, 1159 (Haw. 2004) (discussing the difference between sections 911 and 920A). This version of the "reasonable value" approach is similar to the "actual amount paid" approach, and in fact *Howell* also relied on comment h to Section 911 of the Restatement (Second) of Torts. *Howell*, 257 P.3d at 1138.

Critics of the "reasonable value/actual-amount-paid" approach point out that section 911 of the Restatement (Second) of Torts was never intended to apply to cases involving physical harm. Instead, it is intended to apply in cases where a plaintiff sues to recover the value of property or services *the plaintiff* rendered to the defendant. In contrast, section 920A applies to "Harm to the Person," that is, personal injury cases. *Wills*, 892 N.E.2d at 1027 (citing *Bynum*, 101 P.3d at 1159-60).

Most courts using the reasonable value approach do not limit recovery to the actual amount paid to the medical provider. "A majority of the courts that have considered the issue have concluded 'that plaintiffs are entitled to claim and recover the full amount of reasonable medical expenses charged, based on the reasonable value of medical services rendered, including amounts written off from the bills pursuant to contractual rate reductions.'" *Scott v. Garfield*, 912 N.E.2d 1000, 1011-12 (Mass. 2009) (quoting *Lopez v. Safeway Stores, Inc.*, 129 P.3d 487 (Ariz. Ct. App.2006)); *see Montgomery Ward & Co. v. Anderson*, 976 S.W.2d 382, 385 (Ark. 1998); *Wal-Mart Stores, Inc., v. Crossgrove*, 276 P.3d 562, 565 (Colo. 2012); *Bynum*, 101 P.3d at 1159-60; *Miller*, 177 S.W.3d at 683-64; *Werner v. Lane*, 393 A.2d 1329, 1335-36 (Me. 1978); *Brethren Mut. Ins. v. Suchoza*, 66 A.3d 1073, 1081-82 (Md. 2013); *Papke v. Harbert*, 738 N.W.2d 510, 535-36 (S.D. 2007); *Kenney*, 760 S.E.2d at 446-47; *Leitinger*, 736 N.W.2d at 7-8; Roberts, 31 Rev. Litig. at 117 ("Most state courts . . . hold that the negotiated rate differential is a collateral source benefit and allow injured plaintiffs to recover the full amount of reasonable medical expenses billed . . . ."); *see also Melo v. Allstate Ins. Co.*, 800 F. Supp. 2d 596, 599-600 (D. Vt. 2011) (predicting that Vermont would apply the "reasonable value" rationale in *Leitinger*). These courts adhere to the traditional collateral source rule, as outlined in Section 920A of the Restatement, that tortfeasors

---

[27] Comment *h* to Section 911 addresses how to measure the value of services rendered to another, stating that "[t]he measure of recovery of a person who sues for the value of his services tortiously obtained by the defendant's fraud or duress, or for the value of services rendered in an attempt to mitigate damages, is the reasonable exchange value of the services at the time and place."

should be responsible for all the damage they cause and that plaintiffs, not tortfeasors, should benefit from any negotiated discount. *Wills*, 829 N.E.2d at 1028-29.

Critics of the "reasonable value/full-bill" approach assert that it can lead to a "windfall" for the plaintiff, in that the plaintiff may recover the negotiated rate differential as a medical expense even though he did not actually pay that amount. *See Hanif v. Hous. Auth. of Yolo Cnty.*, 200 Cal. App. 3d 635, 641 (1988). Some argue that the full, undiscounted rate does not represent the reasonable value of the medical expenses, and others point out that permitting the plaintiff to recover the negotiated rate differential may be viewed as punitive toward the defendant in a situation in which punitive damages are not warranted.

A few courts that permit plaintiffs to recover their full, undiscounted medical bills use a "hybrid" method of presenting evidence of "reasonable value" to the jury. Using this method, plaintiffs may submit their full, undiscounted medical bills to establish the "reasonable value" of the medical services received. The defendants, however, may submit evidence that the plaintiff's medical providers accepted less than the full bills to rebut the reasonableness of the full bills, so long as insurance is not mentioned. Alicia Curtis, *The Reasonable Value of Medical Services: A Hospital Bill, The Insurer's Payment, or the Jury's Choice?*, 23 Me. B.J. 78, 79 (Spring 2008); *see Martinez*, 233 P.3d at 222-23, *Stanley*, 906 N.E.3d at 858; *see also Robinson v. Bates*, 857 N.E.2d 1195, 1200 (Ohio 2006) (applying Ohio statute). These courts claim to adhere to the collateral source rule as a substantive rule of law. In the view of these courts, permitting the jury to consider the discounted amounts accepted by medical providers does not violate the collateral source rule so long as the proof does not reveal the plaintiff's insurance policy. As detailed below, this approach, too, has engendered considerable criticism.

Like the majority of jurisdictions, Tennessee courts have generally used the "reasonable value/full bill" approach, as described by our Court of Appeals in *Fye v. Kennedy*, 991 S.W.2d 754, 763-64 (Tenn. Ct. App. 1998). *Fye* is a wrongful death case arising out of a car accident. The decedent's hospital bill was $748,384.08, but her medical providers accepted $75,264 from Medicaid in full payment of those bills. *Fye*, 991 S.W.2d at 762. The defendants in *Fye* made an argument similar to the argument made in the instant case, that the trial court erred in allowing the plaintiffs to recover "the fair value of the services rendered as opposed to the actual amount paid by Medicaid." *Id.* While they did not argue that the undiscounted hospital bill was unreasonable, the defendants in *Fye* contended that the plaintiffs should not be able to recover the amount of a bill they were never required to pay since it was "legally forgiven" by the hospital.

*Id.* at 764 ("There is no suggestion that the hospital bill for $748,384.08 is other than 'reasonable.'").

The Court of Appeals in *Fye* held that evidence of the $75,164 payment was inadmissible based on the collateral source rule, adding that the jury "was not entitled to know that the [decedent's hospital] bill had been partially forgiven." *Id.* at 763-64. The court explained:

> In Tennessee, the focus has always been on the "reasonable" *value* of "necessary" services rendered. A plaintiff must prove that the services rendered were "necessary" to treat the injury or condition in question; and, even if the services were necessary, that the charges in question were "reasonable." The collateral source rule precludes a defendant from attempting to prove that a "reasonable" charge for a "necessary" service actually rendered, has been, or will be, paid by another—not the defendant or someone acting on his or her behalf—or has been forgiven, or that the service has been gratuitously rendered. However, a defendant is permitted to introduce relevant evidence regarding necessity, reasonableness, and whether a claimed service was actually rendered.

*Id.* at 764. The Court of Appeals reasoned, "The theory underlying the collateral source rule is that a tortfeasor should be responsible for 'all harm that he [or she] causes.'" *Id.* (quoting Section 920A, comment *b*). "In applying the collateral source rule and the theory underlying it, there is no reason to differentiate between a payment from a collateral source and a gratuity from a collateral source. In either event, there is a benefit to the injured party that 'should not be shifted so as to become a windfall for the tortfeasor.'" *Id.* (quoting Section 920A, comment *b*).

The Defendants in the instant case argue that it is time for this Court to depart from our current method of allowing plaintiffs to put on proof of their full, undiscounted medical bills in personal injury cases because the amount of those bills is unreasonable as a matter of law. They urge us to adopt the "actual amount paid" approach in *Howell* and hold that plaintiffs in personal injury lawsuits are limited to recovering the discounted amounts accepted by the providers and actually paid by the plaintiff's private insurer. They contend primarily that the "actual amount paid" approach does not implicate the collateral source rule, but regardless, they maintain that plaintiffs should not be permitted to recover more than the amount accepted by medical providers.

Echoing the reasoning in *Howell*, the Defendants argue that the actual amount paid approach is not contrary to the collateral source rule because it does not involve evidence of payments from a collateral source. They note that, under this approach, plaintiffs are still permitted to introduce evidence of all medical expenses actually incurred by them or paid on their behalf, without indicating who made the payments. The negotiated rate differential is not a collateral-source benefit to the plaintiff, they insist, because it benefits only the plaintiff's insurance company. We disagree.

From its inception, the most basic application of the collateral source rule has been to prevent the plaintiff's recovery from being reduced by benefits that are collateral to the defendant, such as insurance benefits. *Mollison*, 58 U.S. at 155; *Anderson*, 33 S.W. at 616. The negotiated rate differential would not exist but for an insurer who "negotiated" the "rate differential" from the plaintiff's full, undiscounted bills. As one court put it, the negotiated rate differential is "as much of a benefit for which [the plaintiff] paid consideration as are the actual cash payments made by his health insurance carrier to the health care providers." *Acuar,* 531 S.E.2d at 322; *see Chionchio v. Correia*, C.A. No. 13-678-M, 2015 WL 13038439, at *2-3 (D.R.I. Aug. 7, 2015) (holding that, in light of the fact that "[t]he collateral source rule is deeply rooted in Rhode Island jurisprudence," the plaintiff "incurred" her medical charges when she received treatment and she remained liable for the full bills until they were paid or forgiven); *Papke*, 738 N.W.2d at 535-36; Roberts, 31 Rev. Litig. at 137 (citing Michael K. Beard, *The Impact of Changes in Health Care Provider Reimbursement Systems on the Recovery of Damages for Medical Expenses in Personal Injury Suits*, 21 Am. J. Trial Advoc. 453, 467 (1988)); *see also Boettcher*, 2016 WL 3212184, at *3 n.4 ("Although Plaintiffs' insurance company may have ultimately received a discount on Plaintiffs' medical bills, Plaintiffs did, at one point in time, 'incur' the total amount of the bills."). One court has described *Howell*'s analysis as "squarely at odds" with the collateral source rule:

> The Court rejects the *Howell* Court's rationale that a write-down is not equivalent to forgiveness of debt because write-downs are prearranged between insurers and providers. A prearranged, yet conditional, forgiveness of debt is still forgiveness of debt, and write-downs are conditional upon payment by a particular third-party payor. If an insurer ultimately rejects coverage for any reason, or if payment by the insurer is otherwise frustrated after treatment, the provider can, and presumably will, still charge the full rate to the patient. Even if there is a preexisting arrangement for a write-down, the write-down does not actually take effect until payment by the insurer is accepted by the provider, i.e., after treatment has been rendered, which is when the patient's duty to pay for it is incurred.

Providers will not typically provide treatment until a patient signs a "financial responsibility" document whereby the patient agrees to pay the full price himself if the insurer ultimately rejects coverage.

*McConnell*, 995 F. Supp. 2d at 1170-71 (citation to *Howell* omitted). One commentator asserted: "[B]ills sent by medical care providers are not a sham for gouging liability carriers. They are real obligations that, but for a plaintiff's private health care insurance, the patient would be responsible for satisfying." Roberts, 31 Rev. Litig. at 140. "[A] privately insured patient actually incurs the medical provider's full charges and only by virtue of this private contract that he entered into in advance is he spared from paying the full amount." *Id.* The enforceability of the full, undiscounted medical bills, absent the intervention of insurance, "is illustrated by the number of personal bankruptcy filings in the United States due to debt resulting from medical bills." *Id.* at 141. For these reasons, we reject the Defendants' argument that adopting the "actual amounts paid" approach does not contravene the collateral source rule. The collateral source rule would apply to preclude evidence of the adjusted price paid by the plaintiff's insurance carrier for the medical services received.

Consequently, to adopt the "actual amount paid" approach urged by the Defendants, we would be required to reject or abrogate the collateral source rule. We note that, in adopting the "actual amount paid" approach, *Howell* relied primarily on the fiction that doing so did not contravene the collateral source rule. We have rejected that reasoning as specious. However, *Howell* used other reasoning as well. The *Howell* Court indicated that it viewed the amount paid by plaintiffs' medical insurance as the most accurate gauge of the reasonable value of medical expenses. In doing so, *Howell* appeared to equate "reasonable value" in this context with "market value." *Howell*, 257 P.3d at 1142 ("the insured plaintiff is permitted to recover the reasonable value or 'market value' of the medical services"). Indeed, even after describing in some detail the competing demands that impact medical providers' pricing of services, *Howell* rather surprisingly reduced it all down to the following: "Given this state of medical economics, how a market value other than that produced by negotiation between the insurer and the provider could be identified is unclear." *Id.* It then held that "the plaintiff may recover no more than the medical providers accepted in full payment for their services." *Id.* at 1143.

In urging adoption of the "actual amount paid" approach, the Defendants pick up on this thread in *Howell* by describing the full, undiscounted medical bills as "elevated above market value." Going further, the Defendants argue: "The term 'reasonable medical expense' is analogous to 'fair market value.' Just as someone who sells a vehicle

- 37 -

or a home accepts and establishes a fair market value, so do medical providers when they accept reasonable medical expenses." Citing a Court of Appeals case on the valuation of a piece of commercial real property, the Defendants conclude, "Simply stated, there can be no better way to establish the reasonableness of medical expenses than to show that amount which was accepted as payment in full." (Citing *Cutshaw v. Hensley*, No. E2014-01561-COA-R3-CV, 2015 WL 4557490, at *1 (Tenn. Ct. App. July 29, 2015)).

We do not pretend to fully understand medical economics or the pricing of medical services in today's environment. Even without a full understanding, however, it is evident that medical expenses cannot be valued in the same way one would value a house or a car, pegging the "reasonable value" at the fair market value, that is, the amount a buyer is willing to pay. Health care services are highly regulated and rates are skewed by countless factors, only one of which is insurance. *See Seely v. Archuleta*, No. 08-cv-02293-LTB-MKT, 2011 WL 2883625, at *5 (D. Colo. July 18, 2011) ("The discounted amount of medical services does not necessarily, and in fact probably does not, reflect the true value of services rendered. . . . A discounted rate. . . generally reflects the third-party payor's negotiating power and the fact that providers enjoy prompt payment, assured collectability."), *quoted in Mathis v. Huff & Puff Trucking, Inc.*, Case No. 12-CV-29-F, 2013 WL 11317952, at *2 (D. Wyo. June 7, 2013); *Radvany v. Davis*, 551 S.E.2d 347, 348 (Va. 2001) (observing that the amounts accepted by the plaintiff's medical providers are negotiated amounts that "do not reflect the 'prevailing cost' of those [medical] services to other patients"). Under these circumstances, equating the value of medical services to the amount the medical provider accepts from an insurance company is simplistic at best and misleading at worst.

Moreover, in advocating the "actual amount paid" approach, the Defendants and the Amicus Defense Lawyers' Association address only the facts presented in this case—personal injury plaintiffs covered by private insurance. Neither addresses how this approach would play out under different facts, such as where the plaintiff is covered by TennCare or by Medicare, or where the plaintiff receives medical care at a veterans' facility, or where the plaintiff receives care at a charitable facility that accepts payment on a sliding-scale, or where the plaintiff's medical care is paid through gift from a parent or other family member. If the "actual amount paid" approach were applied to all of these scenarios, even if the plaintiffs had all received exactly the same medical services, it would cause the awards for their reasonable medical expenses to vary greatly as a matter of law. If, on the other hand, we were to distinguish among the various types of collateral benefits and use the "actual amount paid" approach for some collateral benefits

- 38 -

but not for others, that choice could create an entirely different set of problems.[28]  For example, one state has noted that an approach to the collateral source rule that "effectively creat[es] categories of plaintiffs" based on whether they had private insurance or received charitable benefits would result in a "possible violation of the equal protection provisions of the state and federal Constitutions." *Martinez*, 233 P.3d at 221 (citing *Wentling v. Med. Anesthesia Servs., P.A.*, 701 P.2d 939, 951 (Kan. 1985) (holding that legislature's limitation on collateral source rule was unconstitutional because it violated the equal protection provisions of the state and federal constitutions by discriminating between indigent and insured plaintiffs).

As a further concern regarding the "actual amounts paid" approach, Tennessee Code Annotated section 24-5-113 indicates that introduction into evidence of a personal injury plaintiff's full, undiscounted medical bills can create a *presumption* of the reasonableness of those amounts when certain criteria are met.[29]  Tenn. Code Ann. § 24-

---

[28] With little explanation, *Howell* held that the collateral source rule has "no application to commercially negotiated price agreements like those between medical providers and health insurers" but stated that "donated services are considered to fall within the collateral source rule." *Howell*, 257 P.3d at 1140.  The *Howell* Court saw "no anomaly" in "recogniz[ing] the gratuitous[-]services exception to the rule limiting recovery to the plaintiff's economic loss" because the exception was intended as "an incentive to charitable aid." *Id*.  This reasoning is unsatisfactory.  The collateral source rule was not intended to incentivize "charitable aid."  As explained in comment *b* to section 920A of the Restatement (Second) of Torts, the collateral source rule "does not differentiate between the nature  of the benefits." Restatement (Second) of Torts §920A cmt. b.  The comment explains that "the tortfeasor's responsibility to compensate for all harm that he causes," and "a benefit that is directed to the injured party should not be shifted" so as to become a benefit for the tortfeasor. *Id*.  Thus, there is no basis for the *Howell* Court's reasoning that the collateral source rule applies to "donated services" but not to insurance benefits.  The collateral source rule would apply to both.

[29] Since this statute was enacted in 1978, Tennessee courts have routinely applied the statutory presumption to the amount of medical providers' full, undiscounted bills. *See Borner*, 284 S.W.3d at 218-19 (discussing the legislative history of the statute); *see also West*, 459 S.W.3d at 44 (noting that the presumption in Section 24-5-113 applies to "itemized medical bills" which referred to the full bill, rather than the discounted bill); *Long v. Mattingly*, 797 S.W.2d 889, 893 (Tenn. Ct. App. 1990) (discussing qualities of the expert who can testify to another provider's medical bills).  The lack of any discussion in these cases regarding whether the amounts "paid or incurred" constitute the discounted amounts accepted by medical providers is undoubtedly because the collateral source rule precluded the admission of evidence regarding a plaintiff's insurance benefits.  Given this long-standing judicial application of the statute, we can presume that the Legislature agrees with this application, and there is no authority to suggest otherwise. *See Hardy v. Tournament Players Club at Southwind, Inc.*, 513 S.W.3d 427, 444 (Tenn. 2016) (discussing the doctrine of legislative inaction) (quoting *Hamby v. McDaniel*, 559 S.W.2d 774, 776 (Tenn. 1977)).  For this reason, we reject the Defendants' argument that the language used in Section 24-5-113 supports their position on appeal.

5-113. To now hold that the full, undiscounted medical bills are inadmissible because they are unreasonable *as a matter of law* would conflict with the statutory process for obtaining a legal presumption of reasonableness under Section 24-5-113.

For all of these reasons, we must respectfully reject the argument by the Defendants and the Amicus Tennessee Defense Lawyers' Association urging us to adopt the "actual amount paid" approach as articulated in *Howell*.[30]

Although the Defendants primarily advocate the "actual amount paid" approach, the Court of Appeals below indicated its approval of another approach, namely, the "hybrid" method of proving the "reasonable value" of medical services. Under this method of proving "reasonable value," plaintiffs are allowed to submit the full, undiscounted medical bills into evidence, and defendants are allowed to submit evidence of discounted amounts accepted by medical providers to rebut the plaintiff's proof of reasonableness, so long as insurance is not mentioned. *Dedmon*, 2016 WL 3219070, at 11 (citing *Martinez*, 233 P.3d at 222-23, and *Stanley*, 906 N.E.3d at 858); *see also Patchett v. Lee*, 60 N.E.3d 1025, 1032-33 (Ind. 2016); *Robinson*, 857 N.E.2d at 1200. Although this "hybrid" method is not specifically promoted by the Defendants in their appellate briefs, we will address it since the Court of Appeals lifted it up to us.

Though the hybrid approach may sound like an equitable option, it has not been met with favor. The criticism centers on practical problems that ensue from use of this approach, as well as its effect of undermining the collateral source rule. The concurring/dissenting Justices in *Martinez*, one of the cases cited by the Court of Appeals, pointed out that twenty-two courts had considered the hybrid method and then rejected it. *Martinez*, 233 P.3d at 243 (Davis, C.J., and Rosen and Biles, JJ., concurring in part and dissenting in part) (citing cases). They warned that the hybrid method, adopted in *Martinez* by a slim 4 to 3 majority, "will most surely allow a jury to infer the existence of a plaintiff's insurance, which is forbidden by the collateral source rule; inject jury confusion into what are already complex deliberations at trial; and ultimately lead to the demise of the collateral source rule itself." *Id.* at 237; *see also* Ty A. Patton, *Common Sense and the Common Law, They're Not As Common As They Used to Be: A Critique of*

---

[30] The Amicus Tennessee Defense Lawyers' Association also argues that the mandatory provisions of the Affordable Care Act undermine the necessity of the collateral source rule. Given the continuing uncertain status of the Affordable Care Act, we decline to base our decision on it. *See* Mendez, 94 Denv. L. Rev. Online at *2 & n.8. We also note that, regardless of the Affordable Care Act or any federal insurance program, some plaintiffs will be uninsured.

*the Kansas Supreme Court's New Application of The Collateral Source Rule*, 50 Washburn L.J. 537, 558 (Winter 2011) ("[I]ntroduction into evidence of the lesser amount paid creates a significant risk of jury prejudice, overlooks the dubious correlation that exists between the lesser amount paid and the reasonable cost, and fails to acknowledge that avenues already exist that permit a defendant to challenge the reasonableness of a plaintiff's hospital bill.").

An Ohio intermediate appellate court expressed frustration with the hybrid approach adopted by the Ohio Supreme Court in *Robinson*. *Ross v. Nappier*, 924 N.E.2d 916, 924 (Ohio Ct. App. 2009). The *Ross* court described the hybrid approach as "perplexing," *id.* at 919, and observed that it forces litigants "to navigate an uncertain and complex procedure when presented with a case where the injured party received collateral benefits from a third party." *Id.* at 924. The intermediate appellate court indicated that the hybrid approach had caused confusion in the verdict rendered in that case: "[T]he apparent confusion between the distinct concepts addressed in [*Robinson*] and [Ohio Revised Code section] 2315.20 resulted in the jury being presented with a conundrum, and the resultant confusion is apparent from the record and the verdict." *Id.* at 925.

Other courts have explained that, while advocates of the hybrid approach take the position that it does not contravene the collateral source rule, it is clearly inconsistent with the rule. The Wisconsin Supreme Court has flatly rejected the suggestion that discounted amounts should be allowed to rebut the reasonableness of full, undiscounted bills. *Leitinger*, 736 N.W.2d at 14. *Leitinger* reasoned that allowing such evidence would permit a defendant "to do indirectly what it cannot do directly, that is, it is seeking to limit [the plaintiff's] award by introducing evidence that payment was made by a collateral source." *Id.* The *Leitinger* Court also recognized that unexplained evidence of "accepted payments" would tend to confuse the jury; any attempt by the plaintiff to explain the payments "would lead to the existence of a collateral source." *Id.* (citing *Covington v. George*, 597 S.E.2d 142, 144 (S.C. 2004)); *see also Radvany*, 551 S.E.2d at 348 (holding that amounts paid by insurance are not admissible on issue of reasonableness of full bills).

Similarly, the Supreme Court of Illinois has rejected the hybrid method, stating that evidence of discounted amounts, without mentioning insurance, is improper, confusing, and would essentially force the plaintiff to introduce counter-evidence that would either directly or indirectly reveal the existence of insurance. *Wills*, 892 N.E.2d at 1032-33. As the *Wills* Court explained:

[T]he collateral source rule "operates to prevent the jury from learning anything about collateral income" and . . . the evidentiary component prevents "defendants from introducing evidence that a plaintiff's losses have been compensated for, even in part, by insurance." *Arthur*[ *v. Catour*], 833 N.E.2d 847[, 852 (Ill. 2005)]. Thus, defendants are free to cross-examine any witnesses that a plaintiff might call to establish reasonableness, and the defense is also free to call its own witnesses to testify that the billed amounts do not reflect the reasonable value of the services. Defendants may not, however, introduce evidence that the plaintiff's bills were settled for a lesser amount because to do so would undermine the collateral source rule.

*Id.* at 1033; *see also Aumand v. Dartmouth Hitchcock Med. Cntr.*, 611 F. Supp. 2d 78, 91 (D.N.H. 2009) (evidence of discounted medical bills, even if proffered only to rebut the reasonableness of the undiscounted bills, "strikes the court as an end-run around the collateral source rule.").

The weight of authority criticizing the hybrid method is compelling. We agree with the courts that have concluded that the hybrid approach undermines and contradicts the collateral source rule. At best it would cause confusion by inserting into the evidence discounted payments with no explanation; at worst it would lead the jury to infer the existence of insurance. Moreover, we do not know how such a "hybrid" approach would be applied in cases involving collateral sources other than private insurance. It is unclear what the jury would be told in a case where, for example, the plaintiff paid only a discounted "sliding scale" amount for medical services at a charitable health care facility, or one in which the medical provider accepted a heavily discounted settlement with an uninsured, indigent, "judgment-proof" plaintiff. It is unclear how such an approach would be used for social legislation benefits such as TennCare, where medical providers accept pool payments or set capitation amounts for a single patient. These situations must be considered to evaluate any proposed alternative to the collateral source rule.

As noted above, the majority of courts still apply the collateral source rule to collateral benefits of all types. Moreover, the collateral source rule continues to further substantial public policies. The rule permits plaintiffs, rather than tortfeasors, to receive the benefits of insurance that they had the foresight to purchase. *See O'Bryan*, 892 S.W.2d at 576 ("There is no legal reason why the tortfeasor or his liability insurance company should receive a 'windfall' for benefits to which the plaintiff may be entitled by reason of his own foresight in paying the premium or as part of what he has earned in his employment . . . ."). For collateral benefits other than private insurance, such as

- 42 -

TennCare or Medicare, the same policy reasons apply: the collateral benefits were intended to benefit the injured party, not the tortfeasor who inflicted the injuries. The collateral source rule keeps the focus on tortfeasors' responsibility for paying for all of the harm they cause, not just plaintiffs' net loss.

The Defendants and the Amicus Tennessee Defense Lawyers Association have ably pointed out the shortcomings of the collateral source rule in the current health care environment. They are substantial and we do not minimize them. However, neither the Defendants nor the Amicus has pointed us to a better alternative.

All of the alternative common-law approaches have the effect of undermining the collateral source rule and the significant public policies it continues to serve. A decision to depart from the established precedent of the collateral source rule would have to be supported by the firm belief that justice dictates a different path. None of the common-law alternatives to the collateral source rule give us such a firm belief.

Importantly, we have no assurance that adoption of any of the alternative approaches would result in a more just and accurate assessment of the reasonable value of medical services received by plaintiffs in personal injury cases. *See Seely*, 2011 WL 2883625, at *5 ("The discounted amount of medical services does not necessarily, and in fact probably does not, reflect the true value of services rendered. . . . A discounted rate, however, generally reflects the third-party payor's negotiating power and the fact that providers enjoy prompt payment, assured collectability."), *quoted in Mathis v. Huff & Puff Trucking, Inc.*, Case No. 12-CV-29-F, 2013 WL 11317952, at *2 (D. Wyo. June 7, 2013); *Radvany* 551 S.E.2d at 348 (observing that the amounts accepted by the plaintiff's medical providers are negotiated amounts that "do not reflect the 'prevailing cost' of those [medical] services to other patients"); *Stanley*, 906 N.E.2d at 857 (expressing doubt "that the reasonable value of medical services is necessarily represented *by either* the amount actually paid or the amount stated in the original medical bill"); *see also Haygood*, 356 S.W.3d at 393.

Moreover, instead of simply fixing problems associated with the collateral source rule, each of the alternative approaches appears to create a whole different set of problems. Under these circumstances, adoption of any of the alternative common-law approaches would amount to opening the proverbial "can of worms," that is, in the course of trying to remedy problems associated with the collateral source rule, we would end up creating a litany of other problems.

The essential criticism of the collateral source rule from the Defendants and the Amicus Tennessee Defense Lawyers Association is that, absent evidence of the discounted medical bills, the jury is free to award the amount of the full, undiscounted medical bills, which does not represent the reasonable value of the medical services. Excluding evidence of the discounted medical bills, they argue, may result in overcompensation to a plaintiff who did not have to pay the full amounts.

Indeed, potential overcompensation of plaintiffs has been a recognized drawback of the collateral source rule since its inception. *See* Restatement (Second) of Torts § 920A cmt. b ("The injured party's net loss may have been reduced [by collateral benefits], and to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury."). However, as recognized by the United States Supreme Court: "The law contains no rigid rule against overcompensation. Several doctrines, such as the collateral benefits rule, recognize that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation." *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 219 (1994) (footnote omitted).

Under the present law in Tennessee, plaintiffs in personal injury cases may use their full, undiscounted medical bills to satisfy the burden of proving the reasonable value of medical expenses. To rebut the plaintiffs' proof that those charges are reasonable, defendants are free to submit any competent evidence in rebuttal that does not run afoul of the collateral source rule. *See Fye*, 991 S.W.2d at 764 (noting that "a defendant is permitted to introduce relevant evidence regarding necessity, reasonableness, and whether a claimed service was actually rendered"). The jury then determines the "reasonable value" of the medical services in light of all of the evidence.

On balance, we must conclude that the Defendants have presented insufficient bases for us to depart from Tennessee's long-standing adherence to the collateral source rule in personal injury cases. *See In re Estate of McFarland*, 167 S.W.3d 299, 306 (Tenn. 2005) ("The power of this Court to overrule former decisions 'is very sparingly exercised and only when the reason is compelling.'" (quoting *Edingbourgh v. Sears, Roebuck & Co.*, 337 S.W.2d 13, 14 (Tenn. 1960))). "Recent reports of the impending death of the collateral source rule are greatly exaggerated." Mendez, 94 Denv. L. Rev. Online at *9 (quoting Adam G. Todd, *An Enduring Oddity: The Collateral Source Rule in the Face of Tort Reform, the Affordable Care Act, and Increased Subrogation*, 43 McGeorge L. Rev. 965, 965 (2012)). We choose not to alter existing law in Tennessee regarding the collateral source rule.

In light of our holding, we affirm the Court of Appeals' reversal of the trial court's grant of the Defendants' motion *in limine*. To the extent that the Court of Appeals indicated that the Defendants would, on remand, be able to introduce evidence of lesser amounts accepted by Mrs. Dedmon's medical providers in order to rebut the Plaintiffs' proof on reasonableness, we reverse that holding.

## CONCLUSION

In sum, we hold that the definition of "reasonable charges" under the Hospital Lien Act set forth in *West v. Shelby County Healthcare Corp.*, 459 S.W.3d 33 (Tenn. 2014), does not apply directly to determinations of "reasonable medical expenses" in personal injury cases; the *West* definition of "reasonable charges" is limited in application to interpretation of the Hospital Lien Act. We also decline to alter existing law in Tennessee regarding the collateral source rule. Consequently, the Plaintiffs may submit evidence of Mrs. Dedmon's full, undiscounted medical bills as proof of her "reasonable medical expenses," and the Defendants are precluded from submitting evidence of discounted rates for medical services accepted by medical providers as a result of Mrs. Dedmon's insurance. The Defendants remain free to submit any other competent evidence to rebut the Plaintiffs' proof on the reasonableness of Mrs. Dedmon's medical expenses, so long as the Defendants' proof does not contravene the collateral source rule. Thus, we affirm the Court of Appeals' decision to reverse the trial court's grant of the Defendants' motion *in limine*, but we reverse the Court of Appeals to the extent that it held that the Defendants could introduce evidence of lesser amounts accepted by Mrs. Dedmon's medical providers in order to rebut the Plaintiffs' proof on reasonableness.

Accordingly, the decision of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded to the trial court for further proceedings consistent with this Opinion. Costs on appeal are to be taxed to the Appellants/Defendants, Debbie Steelman and Danny T. Cates, Sr., as co-personal representatives of the Estate of John T. Cook, deceased, and their surety, for which execution may issue, if necessary.

_____
HOLLY KIRBY, JUSTICE